1   Steven M. McQuillan, No. 107339
    JACOBSON, HANSEN, NAJARIAN & McQUILLAN
2   A Professional Corporation
    1690 W. Shaw Avenue, Suite 201
3   Fresno, California 93711
    Telephone: (559) 448-0400
4   Facsimile: (559) 448-0123

5   Atorneys for Plaintiff CISLYN BLACKWOOD

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10  CISLYN BLACKWOOD,                    | Case No.:  1:08-CV-01822-AWI-DLB

11                      Plaintiff,       | **TRIAL BRIEF OF PLAINTIFF CISLYN
          v.                             | BLACKWOOD**
12
    SUN LIFE ASSURANCE COMPANY OF        | Date: April 28, 2009
13  CANADA, SUN LIFE FINANCIAL,          | Time: 9:00 a.m.
    COMMUNITY HOSPITALS OF CENTRAL       | Courtroom 2, 8th Floor
14  CALIFORNIA dba COMMUNITY MEDICAL
    CENTERS EMPLOYEE BENEFIT PLAN and
15  DOES 1-10

16                      Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.  Procedural Background ............................................................................. 1

II.  Factual Summary and Analysis.................................................................. 2

    1.  Blackwood's Participation in the Community Hospital
       of Central California Employee Benefit Plan ........................................ 2
    2.  Multiple Myeloma. .............................................................................. 3
    3.  Disability Claim ................................................................................... 4
    4.  Claim History ...................................................................................... 6
    5.  Sun Life Medical Evaluation ............................................................... 7

III.  Occupational Analysis............................................................................ 10

    1.  Cislyn Blackwood's Job Duties and Responsibilities ......................... 10
    2.  Sun Life Occupational Analysis. ........................................................ 11

IV.  Physical Disability Analysis .................................................................... 14

    1.  The Opinions and the Designated Medical Experts ........................... 14
    2.  Balducci and Schneider Failed to Address the APS. ........................... 15
    3.  Drs. Balducci and Schneider Were Not Provided Complete Medical
       Records .............................................................................................. 16
    4.  State Disability Benefits...................................................................... 18
    5.  Sun Life Use of Improper Standard ................................................... 21

V.  Cognitive Impairment Analysis............................................................... 22

VI.  Lack of Thoroughness of Disability Evaluation ........................................ 27

VII.  Conclusion ........................................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*Beckstrand v. Elec. Arts Group Long Term Disability Ins. Plan,*
2008 U.S. Dist. LEXIS 83195 (E.D. Cal. Sept. 16, 2008) ......................................... 16, 28

*Black & Decker v. Nord,*
(2003) 538 U.S. 822 ................................................................................. 18, 19, 20

*Calvert v. Firstar Finance, Inc.,*
409 F.3d 286, 295 (6th Cir. 2005) ................................................................... 19

*Delisle v. Sun Life Assur. Co.,*
2009 U.S. App. LEXIS 4251 (6th Cir. Mich. 2009) ........................................ 17

*Glenn v. MetLife,*
461 F.3d 660, 669 (6th Cir. 2006) ......................................................... 17, 19

*Kearney v. Standard Ins. Co.,*
175 F.3d 1084 (9th Cir. 1999) ...................................................................... 1

*Hawkins v. First Union Corporation Long-Term Disability Plan,*
326 F.3d 914, 918 (7th Cir. 2003 ........................................................... 21, 22

*Jordan v. Northrop Grumman Corporation Welfare Benefit Plan,*
(2003) 370 F. 3rd at 869 ........................................................................ 19, 20

*Leffew v. Ford Motor Co.,*
258 Fed. Appx.. 772, 2007 WL 4443520, *7 (6th Cir. 2007) (Unpub. Disp.) ................ 19

*Mitchell v. Metro. Life Ins. Co.,'*
523 F. Supp. 2d 1132, 1148 (D. Cal. 2007) ................................................. 22

*Moskowite v. Everen Capital Corp., No.*
C 03 4666 MMC(MED), 2005 U.S. Dist. LEXIS 20842, 2005 WL 1910941, *4 n. 5
(N.D. Cal. Aug. 10, 2005) ........................................................................ 19

*Prado v. Allied Domecq Spirits & Wine Group Disability Income Policy,*
2008 U.S. Dist. LEXIS 4295 (N.D. Cal. Jan. 22, 2008) ................................... 26

*Ratkovic v. Northrop Grumman Corp. Emple. Welfare Benefit Plan,*
2009 U.S. Dist. LEXIS 13862 at pages 37-41 (C.D. Cal. Feb. 20, 2009).......................... 20

*Ray v. Unum Life Ins. Co. of Am.,*
224 Fed. Appx. 772, 787 (10th Cir. Colo. 2007) ....................................... 25

1  Steven M. McQuillan, No. 107339
   JACOBSON, HANSEN, NAJARIAN & McQUILLAN
2  A Professional Corporation
   1690 W. Shaw Avenue, Suite 201
3  Fresno, California 93711
   Telephone: (559) 448-0400
4  Facsimile: (559) 448-0123

5  Atorneys for Plaintiff CISLYN BLACKWOOD

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10 | CISLYN BLACKWOOD,                    | Case No.:  1:08-CV-01822-AWI-DLB

11 |                Plaintiff,            | **TRIAL BRIEF OF PLAINTIFF CISLYN**
         v.                              | **BLACKWOOD**
12
13 | SUN LIFE ASSURANCE COMPANY OF        | Date: April 28, 2009
     CANADA, SUN LIFE FINANCIAL,         | Time: 9:00 a.m.
     COMMUNITY HOSPITALS OF CENTRAL      | Courtroom 2, 8th Floor
14   CALIFORNIA dba COMMUNITY MEDICAL
     CENTERS EMPLOYEE BENEFIT PLAN and
15   DOES 1-10

16 |                Defendants.

17

18         COMES NOW Plaintiff, CISLYN BLACKWOOD, by and through her attorneys, the

19 law firm of Jacobson, Hansen, Najarian & McQuillan and submits the following as her Trial

20 Brief.

21                                    **I.**

22                        **PROCEDURAL BACKGROUND**

23         Plaintiff filed her Complaint under the Employee Retirement Income Security Act of

24 1974, 29 U.S.C. §1001 et seq. (hereafter "ERISA"), seeking recovery of long term disability

25 benefits.  The parties have previously stipulated that this benefit decision is subject to de

26 novo review. The parties furthermore stipulated to submit the case for decision after the filing

27 of trial briefs on the administrative record as discussed in *Kearney v. Standard Ins. Co.*, 175

28 F.3d 1084 (9th Cir. 1999). Plaintiff, pursuant to that stipulation, submits the following as her

1  Opening Brief. Plaintiff has, concurrent with the filing of her Trial brief, filed a copy of the

2  Administrative Record as augmented by the Court's Order of March 10, 2009.[1]

3                                              II.

4                        **FACTUAL SUMMARY AND ANALYSIS**

5  **1.    BLACKWOOD's Participation in the Community Hospitals of Central California**

6         **Employee Benefit Plan**

7         CISLYN BLACKWOOD was employed by Community Hospitals Of Central California

8  as the manager of their skilled nursing department through August 2006. CISLYN

9  BLACKWOOD was employed for 25 years with Valley Medical Center and subsequently with

10  Community Hospitals following their merger. (AR110)

11         Defendant, Community Hospitals of Central California dba Community Medical

12  Centers Employee Benefit Plan, (hereafter referred to as the "PLAN"), is an employee benefit

13  plan as defined under ERISA. (Undisputed Fact #B ) Community Hospitals of Central California

14  provides group disability insurance benefits to PLAN participants through a policy of insurance

15  purchased by the PLAN. (Undisputed Fact #C) Defendant SUN LIFE is the insurer for the PLAN.

16  (AR36)

17         CISLYN BLACKWOOD, as a part of her compensation package, was enrolled as a

18  participant in the PLAN. (Undisputed Fact #A) CISLYN BLACKWOOD herself paid extra

19  premium payments toward the purchase of the disability policy so as to entitle her to enhanced

20  disability benefits. (Undisputed Fact #B) These enhanced benefits provided that in the event she

21  became disabled, she would be entitled to recover 66% of her pre-disability salary minus

22  certain offsets for specified income received from other sources. (AR40)

23         The PLAN specifies that a participant is "Totally Disabled" if "during the Elimination

24  Period and the next 24 months, the employee, because of Injury or Sickness, is unable to

25  perform the Material and Substantial Duties of his own Occupation". (AR50)

26

27  ——————————————

28  [1] The parties have agreed that if, prior to trial, they are unable to resolve the amount of accrued damages owed and the court should find in favor of Plaintiff, that this issue will be resolved post verdict as part of the fee petition.

1  **2.    Multiple Myeloma**

2      CISLYN BLACKWOOD saw Dr. Helen Jones (her primary care physician) in

3  September 2001 and Ms. BLACKWOOD complained to her of numbness and weakness of

4  her right lower extremity, numbness to her coccyx area, shortness of breath upon exertion,

5  right leg stiffness, muscle cramps in her right and left legs and feet and decreased appetite.

6  (Blackwood Suppl. 5 - 6[2])    She also reported to Dr. Jones experiencing symptoms of fatigue

7  that she has had for years but which had been worsening.   CISLYN BLACKWOOD was

8  referred to Dr. Peter Wittlinger for an oncology consultation in September 2001 and shortly

9  thereafter she was diagnosed with multiple myeloma. (Blackwood Suppl. 10-11)

10     Multiple myeloma is an incurable hematological malignancy of plasma cells, the cells of

11  the immune system that produce antibodies.    Although it initially develops in the bone

12  marrow, it spreads to the peripheral blood, lymph nodes, and other organs.   The disease

13  typically causes chronic pain, muscle weakness, fatigue, difficulty walking, peripheral

14  neuropathy, numbness and tingling.    Its prognosis, in spite of therapy, is generally poor.

15  Myeloma presents with pain and continues throughout the life of the patient. (AR 362)

16     The medical records of CISLYN BLACKWOOD between 2001 and 2006 show that

17  she repeatedly reported to her doctors that she was suffering pain in all of her joints including

18  her neck, back, hips, knees and ankles. She also repeatedly reported to her doctors that her

19  cancer also caused her to experience symptoms of fatigue, generalized weakness and extreme

20  swelling.

21          The patient presented last summer complaining of significant
           muscle weakness, worsening dyspnea on exertion, diffuse joint
22          pains, and progressive fatigue. (AR 33)

23          She presented with polyarthralgias, myalgias, easy fatiguability,
           to her joints to the point that she difficult time lifting herself up
24          from a toilet seat without the use of her arms. (AR 56)

25

26

27  ――――――――――――――――――――――――――――――――――――――――――――

28  [2] The documents referenced in this Trial brief as "Blackwood Suppl." are those documents which the court has
   authorized Plaintiff to file pursuant to the Court's order of March 11, 2009. The documents referenced by "AR"
   are those documents contained in the original Administrative Record. All documents referenced as "AR" and
   "Blackwood Suppl." have been filed concurrent with this Trial Brief.

1  (See also Blackwood Suppl. 119, 5-6, 7-9, 19, 20, 22, 25, 33-35, 40-41, 43-44, 45, 175-177,

2  178-180, 59, 62, 63, 64, 67, 190-191, 91-92, 213) CISLYN BLACKWOOD has taken a wide

3  variety of medications since she was diagnosed with cancer including Thalidomide,

4  Celebrex, Decadron, Benadryl, Ativan, Aredia, Darvocet, Coumadin, Klonopin and

5  Tramadol (AR 80, 83, 88, 90, 94,97) CISLYN BLACKWOOD was also recorded on two

6  separate occasions as having experienced cognitive difficulties attributed to the medications

7  that she was taking. (Blackwood Suppl. 29, 30) The symptoms of CISLYN BLACKWOOD

8  waxed and waned over the years after she was first diagnosed with multiple myeloma, but as

9  stated by Dr. Wittlinger, she has consistently suffered from her symptoms since 2001.

> Patients who I am treating for multiple myeloma have their good days, weeks and months and their bad days, weeks and months. Cislyn Blackwood's medical history is typical of multiple myeloma patients whom I am treating. When I first began treating Cislyn Blackwood, she was suffering muscle weakness, bone pain, fatigue, localized paresthesia and peripheral neuropathy. Cislyn Blackwood has continued to experience all of these symptoms, on and off, since the time that I first saw her with her symptoms sometimes better than on her last visit and sometimes worse. (Paragraph 4, Declaration of Dr. Peter Wittlinger)

16  Despite the pain, fatigue and weakness associated with her cancer and the side effects

17  and symptoms associated with the medications that she took to treat her cancer, CISLYN

18  BLACKWOOD continued to work at her job as a manager for Community Hospitals of Central

19  California until August 16, 2006.

20  ### 3.   Disability Claim

21  CISLYN BLACKWOOD determined on August 16, 2006 that she could no longer

22  continue working. On January 30, 2007, CISLYN BLACKWOOD applied for her group

23  disability benefits under the PLAN. (AR182-186) CISLYN BLACKWOOD, as required under

24  the provisions of the PLAN[3], subsequently informed SUN LIFE of what she understood her

25  disability to be, the date that the disability began and the causes of her disability. She also

26  executed a release to allow SUN LIFE to obtain all of her medical records.

---

[3] The Plan provides that a "proof of claim" consists of the claimant's statement of: - what the disability is; the date the disability occurred; and the cause of the disability. (AR Doc. # 33)

1    CISLYN BLACKWOOD informed SUN LIFE that she had been experiencing pain in
2    all of her joints including her neck, hips, back, knees and ankles as well as swelling and
3    general weakness. (AR 207) She advised SUN LIFE that physical exertion caused her an
4    increase of pain and fatigue and that she was having difficulty using her arms and hands, had
5    only limited strength and experienced difficulty walking. (AR 207, 362) CISLYN
6    BLACKWOOD also advised SUN LIFE that she had been experiencing these problems for
7    some time but that these symptoms had been getting progressively worse, particularly in the
8    last year. (AR343, 362) She advised them that although there had been a 6month period of
9    time that she had been able only to work 2 weeks per month (AR 209), she had wanted to
10   work as long as she could. She had continued working even though her doctors had told her,
11   after she was first diagnosed, that she should stop working. (AR 209)

12   CISLYN BLACKWOOD also informed SUN LIFE that she was experiencing cognitive
13   impairments. (AR 209)  Specifically, CISLYN BLACKWOOD informed SUN LIFE that she
14   used to read more but that the steroids and medications she was taking were having an effect
15   on her mental abilities (AR 208, paragraph E) and that the medications were affecting her
16   cognitive abilities, including her memory. (AR 209, paragraph 2D) The SUN LIFE investigator
17   recorded that the medications that CISLYN BLACKWOOD was then taking included:
18   Thalmidomide, Decadron, Klonopin, Coumadin, Lasix, Lipitor and Potassium. During the
19   course of a face-to-face interview with CISLYN BLACKWOOD conducted on March 3, 2007,
20   a SUN LIFE investigator recorded what he observed as to her cognitive functioning:

21           Mental Capacity:  The claimant seemed to comprehend the
             questions, but at times seemed to lose her train of thought and
22           would ask things such as, "What was the question again?"  It
             was often necessary to repeat questions during the course of
23           this interview.   She commented several times that her
             medications "mess up her brain" and they reduce her critical
24           thinking and make her forgetful. (AR 210 ¶5 D)

25   CISLYN BLACKWOOD informed the SUN LIFE investigator that she believed that she
26   was unable to return to work not only because of the pain, weakness and fatigue she was
27   experiencing but also because of the impact the medications were having on her memory
28   and on her ability to walk. (AR 362-363)   CISLYN BLACKWOOD expressed to the

investigator that this was a concern to her because her job requires her to be alert, as the lives and welfare of patients were in her hands. (AR 363) The Administrative Record reflects that CISLYN BLACKWOOD repeatedly informed SUN LIFE that she was suffering from cognitive impairments in that the medications were impairing her memory and her ability to retain new information leaving her unable to carry out her job duties. (AR 182, 196, 209, 212, 366 and 343) The medical record confirms that on at least two occasions, CISLYN BLACKWOOD also brought this problem to the attention of her doctors. (Blackwood Suppl. 29, AR194).

CISLYN BLACKWOOD was treated by a number of doctors and has undergone various treatments for her cancer including daily chemotherapy since August 2004. Dr. Peter Wittlinger is the oncologist with whom Plaintiff has consistently treated for her multiple myeloma. Dr. Wittlinger was asked by SUN LIFE to submit an Attending Physician Statement (APS) giving his opinion as to whether CISLYN BLACKWOOD was disabled. (AR 192) Dr.Wittlinger indicated that CISLYN BLACKWOOD had been suffering from a chronic ongoing condition since 2001. Dr. Wittlinger specifically indicated in the APS that she was limited in her physical activities as follows: Sit 1-3 hours, Stand 1-4 hours. Dr. Wittlinger also indicated in the APS that during the day the patient is able to bend, twist, climb, push, pull, balance reach, grasp and kneel only "1-33%" of the time. Dr. Wittlinger concluded that CISLYN BLACKWOOD "Cannot work 8 hour day" and was only "OK to work 2 hour day with restrictions." (AR 193) It was the opinion of Dr. Wittlinger that she was limited by a "Class 4 Moderate limitation of functional capacity (60-70%)"that limited her ability to work to "part time within limitations" and that she was not capable of working another occupation full/part time. (AR 193)

**4.    Claim History**

On or about January 30, 2007, CISLYN BLACKWOOD applied for her group disability benefits under the PLAN. CISLYN BLACKWOOD subsequently advised SUN LIFE that she had applied for and was receiving disability benefits from the State of California. (AR184) On July 2, 2007, CISLYN BLACKWOOD was informed by Sun Life Assurance Company Of Canada that her request for disability benefits was denied based on their determination that she

1 | was not medically disabled from returning to her job. (AR351-357) CISLYN BLACKWOOD

2 | timely filed an appeal of the denial of her claim for disability benefits.  On November 8, 2007,

3 | SUN LIFE advised Plaintiff that they had determined that the denial of her claim for long term

4 | disability benefits was appropriate and that she had now exhausted all her administrative

5 | remedies. (AR411-416)

6 | **5.    SUN LIFE Medical Evaluation**

7 | SUN LIFE retained two physicians to conduct an analysis of Plaintiff's medical

8 | records; Dr. Andrew Schneider and Dr. Lodovico Balducci.[4] Dr. Andrew Schneider and Dr.

9 | Lodovico Balducci limited their review of Plaintiff's medical records to the period from

10 | January 2006 to May 2007 as SUN LIFE had elected to obtain only that portion of CISLYN

11 | BLACKWOOD's medical records. SUN LIFE also elected not to ask CISLYN BLACKWOOD

12 | to submit to either an IME or FCE.[5] (AR 93-94, Note of 11/08/07 "An FCE or IME at time of

13 | EP would have been helpful")

14 | Dr. Schneider concluded in his report of June 20, 2007 that CISLYN BLACKWOOD

15 | had the "functional capacity to perform full time sedentary work" and that her "neuropathy

16 | would not preclude full time sedentary work". (AR 314) It is evident, however, that the

17 | conclusion expressed by Dr. Schneider was based, at least in part, on the absence of any

18 | marked change in the claimant's condition between January 2006 and  to August 16, 2006.

19 | (AR 313 at AR 315) There is no way of knowing whether Dr. Schneider would have offered

20 | the opinion that CISLYN BLACKWOOD could perform full time sedentary work if he had

21 | been provided with any of Plaintiff's medical records from 2001, when she was first

22 | diagnosed with multiple myeloma.

23 | Dr. Schneider's conclusion is allegedly based on his interpretation of certain notations

24 | in his limited medical records from Dr. Wittlinger that CISLYN BLACKWOOD's condition

25 | was "stable" and that she was "asymptomatic". Dr. Schneider had no way of knowing that

26 |

27 |

28 |

---

[4] Plaintiff has no information as to the relationship between these doctors and SUN LIFE nor the number of times that SUN LIFE has sought opinions from these same physicians.
[5] Functional Capacity Evaluation. The typical purpose of the FCE is to direct further therapy, evaluate the extent of a disability, and assess a claimant's capacity for work in the future.

her condition has been progressively deteriorating in the years prior to August 2006 and consequently had no way of knowing what Dr. Wittlinger intended by his use of the terms "stable" and "asymptomatic".

> I periodically use the terms "stable" and "asymptomatic" in my medical records pertaining to Cislyn Blackwood. These terms were meant by me to indicate that there had been no acute deterioration in her cancer (no fever, no pneumonia, no bleeding) between the date of that visit and her last visit with me.

(AR-Declaration of Dr. Peter Wittlinger, paragraph 5)

Although Dr. Schneider does acknowledge that the medications that CISLYN BLACKWOOD was then taking could have caused peripheral neuropathy and fluid retention, Dr. Schneider failed in his report to address at all the cognitive problems reported by CISLYN BLACKWOOD that she believed were being caused by her medications. (AR 314)

SUN LIFE subsequently retained Dr. Lodovico Balducci to perform an independent assessment. Unfortunately, SUN LIFE not only failed to provide Dr. Balducci with any of the Plaintiff's medical records pre-dating January 2006, but also failed to provide Dr. Balducci with the Attending Physician Statement prepared by Dr. Wittlinger. (AR 192-195) Plaintiff submits that there is no way of knowing whether Dr. Balducci would have offered the opinions that he did as to CISLYN BLACKWOOD's ability to perform full time sedentary work if he had been provided with any of Plaintiff's medical records from the date she was first diagnosed with multiple myeloma or provided with the Attending Physician Statement SUN LIFE had asked Dr. Wittlinger to prepare.

Dr. Balducci prepared a report dated October 30, 2007. Dr. Balducci, at page 6, paragraph 11, of that report concluded that:

> "Throughout the medical records, there is support that Ms. Blackwood could not have performed full time light work activity throughout and beyond the elimination period. Ms. Blackwood could not have performed this full time light work activity including lifting, carrying, pushing and pulling 20 pounds occasionally and frequently up to 10 pounds due to the fact that she has been sick for approximately five years with multiple myeloma and has been treated with aggressive chemotherapy and she was on continuous treatment with a drug that may have caused peripheral neuropathy. **Therefore,**

1      given the above-described findings, Ms. Blackwood could not
have performed full-time light work activity throughout and
2      beyond the elimination period of 08/16/06 though
11/13/2006, and thereafter." (Emphasis added) (AR 385 at
3      paragraph 11)

4      On October 30, 2007, therefore, it was the opinion of Dr. Balducci that CISLYN

5 BLACKWOOD could not perform full-time light work throughout and beyond the

6 elimination period.

7      On November 6, 2007, shortly after receipt of the report from Dr. Balducci, [6] SUN

8 LIFE benefit consultant Morse Doane contacted Dr. Balducci to question him about the

9 above quoted paragraph 11. A letter written by Morse Doane dated November 6, 2007

10 summarizes her conversation with Dr. Balducci:

11      "I asked why he then advised that Ms. Blackwood could not
have performed light work during the elimination period? I
12      advised that I don't see any proof to support that assessment.
Dr. Balducci took a moment to review his response and said
13      that he sees where I am coming from. He explained that, based
on his experience, people with this condition will often
14      experience fatigue and that was why he made his statement.
However he agreed that the medical proof did not show any
15      change in Ms. Blackwood's condition.

16      I pointed out that Ms. Blackwood was diagnosed with multiple
myeloma in 2001 but worked for many years thereafter in her
17      occupation. In fact, she took on more responsibility, managing
two nursing operations for a period of time. She scaled that
18      back eventually but continued to perform her occupation. I
said I just don't see what changed such that she was capable of
19      working full time in her occupation on 8/15/06 but then had to
stop working on 8/15/06 and thereafter. I said the essential
20      question I have to ask is this: Is there any medical reason Ms.
Blackwood would not have been able to continue performing
21      after she stopped working the same type of activities she had
been performing before she stopped working?" (AR 409)

22

23      The opinion of Dr. Balducci expressed in his report of October 30, 2007, that CISLYN

24 BLACKWOOD **could not perform light** work, was not modified following his conversation

25 with Morse Doane.

26

27 _____

28 [6] Significantly, Morse Doane contacted Dr. Balducci after SUN LIFE received an in house occupational analysis
dated 11/01/07 that concluded that the job that CISLYN BLACKWOOD performed required medium level
exertion. (AR 388-391)

### III

### OCCUPATIONAL ANALYSIS

**1.    CISLYN BLACKWOOD's Job Duties and Responsibilities**

CISLYN BLACKWOOD was employed by Community Hospitals of Central California as the manager of their Skilled Nursing Facility. CISLYN BLACKWOOD informed SUN LIFE that her job duties included the coordination of delivery of care to medical surgical patients on a unit including hiring, training, staff development, evaluating staff performance, evaluating staff-patient satisfaction, time keeping for payroll, staff retention and discipline of 28 staff on those 2 units. (AR 110, 182, 186, 212) CISLYN BLACKWOOD additionally informed SUN LIFE that her job duties required her to assess new patients, report unusual incidents to DHS, plan excursions for residents of the facility, plan and direct social and religious activities in collaboration with the activity director, follow up any grievance report by residents, conduct daily rounds of patients to check their physical condition and monitor units for any violations. (AR 110, 212) In the Employers Statement (AR 110) submitted by the Plaintiff's supervisor, the physical aspects of BLACKWOOD's particular job was described as requiring 4 hours of sitting, 2 hours standing, 2 hours walking and specifically requiring her occasionally (1/4 – 2 ½ hours) to bend, push, pull, lift, and frequently (2 ½ – 5 ½ hours) to reach, balance and carry. The Job Description (Director of Nursing Services) supplied by Community Hospitals of Central California (AR 114) specified the job duties of BLACKWOOD's to include:  Primary function is the total management of nursing services directed to meet the individual needs of each resident and to ensure compliance with local, state and federal regulations. Responsible for direction of resident care in the skilled nursing facility. Additionally, the Job Description (AR 114-116) specified the physical requirements of the job as including:

> Sitting frequently (>50% of time)
> Regular standing (25%-50%)
> Walking (25%-50%)
> Occasional climbing, reaching, bending, kneeling (<25%)
> Occasional pushing/pulling 11-25lbs (<25%)

1    Dr. Wittlinger indicated in the APS that CISLYN BLACKWOOD was limited in her

2  physical activities. He offered the opinion that CISLYN BLACKWOOD could only sit 1-3

3  hours and that she could only stand 1-4 hours in an 8 hour day. Dr. Wittlinger also indicated

4  in the APS that during the day the patient is able to bend, twist, climb, push, pull, balance

5  reach, grasp and kneel only "1-33%" of the time. One percent of an 8 hour day equals 4.8

6  minutes while thirty three percent equals just over 2 ½ hours per day.

7    A comparison of the physical requirements set forth in the job description provided

8  by Community Hospital with the limitations expressed by Dr. Wittlinger in the APS

9  establishes that CISLYN BLACKWOOD was disabled from returning back to work at any

10  time during the elimination period. CISLYN BLACKWOOD, according to Dr. Wittlinger,

11  would be unable to work at her particular job as she would be unable to sit the more than 4

12  hours per day that her job required. She would also be unable to stand the more than 4

13  hours per day that her job required. CISLYN BLACKWOOD would also be unable to bend,

14  climb, push, pull or reach as much as would have been required of her.

15    Plaintiff submits that Sun Life is required to accept the interpretation of the APS most

16  favorable to Plaintiff as it was SUN LIFE that provided Dr. Wittlinger with the Attending

17  Physician Statement that he was asked to submit. (AR 193) Sun Life is the claims

18  administrator with final authority over any award of benefits as well as the PLAN insurer.

19  Plaintiff submits that any ambiguity that SUN LIFE is responsible for creating should be

20  interpreted in a manner most favorable to Plaintiff so as to ensure against the possibility that

21  Sun Life could interpret the ambiguity to their financial benefit and to the detriment of the

22  insured.

23  **2.    SUN LIFE Occupational Analysis**

24    Robert Violetta, an occupational analyst employed by SUN LIFE, prepared an

25  occupational analysis of Ms. Blackwood's job dated November 1, 2007. At page 2 of that

26  report Violetta concluded as follows:

27    "It is my opinion, that Ms. Blackwood's occupation
     corresponds best to Nurse, Head DOT#075.137-014."

28    "Ms. Blackwood's occupation exists typically in the general
     economy, according to the Dictionary of Occupational Titles,

at a medium exertion level - i.e. lifting, carrying, pushing, pulling 20-50 lbs. occasionally, 10-25 lbs. frequently with frequent standing and walking in a workday. Her occupation also typically requires frequent stooping, reaching (including overhead reaching), handling, fingering, talking, hearing, near acuity and color vision and occasional feeling." (AR 389)

The job that Mr. Violetta concluded best corresponded with Plaintiff's particular duties is that of "Head nurse" as more fully described in DOT 075.137-014. (AR 389-390) That job, as specified in DOT 075.137-014 requires the following:

PHYSICAL REQUIREMENTS:

STRENGTH:   Medium Work – Lifting, Carrying, Pushing, Pulling 20-50lbs. occasionally, 10-25lbs. frequently or up to 10lbs. constantly.

STOOPING: Frequently – Bending body downward and forward by bending spine at the waist, requiring full use of the lower extremities and back muscles.

REACHING: Frequently – Extending hand(s) or arm(s) in any direction.

HANDLING: Frequently – Seizing, holding. Grasping, turning, or otherwise working with hand or hands.   Fingers are involved only to the extent that they are an extension of the hand, such as to turn a switch or shift automobile gears. (AR390)

This job, Mr. Violetta concluded in his Occupational Analysis dated November 1, 2007, typically exists at a medium exertion level. (AR 390)

On November 6, 2007, the same day that Morse Doane contacted Dr. Balducci to question his conclusion that CISLYN BLACKWOOD could not perform light work, Morse Doane contacted Robert Violetta to discuss with him his conclusion that CISLYN BLACKWOOD's job required a medium exertion level.

Morse Doane called me today to alert me to phone contact that Libby held with Blackwood on 3/7/07. Libby documents that CB told her that her job was sedentary and that she did not lift or carry patients. Doane asked me to address this and if it had any impact on my analysis.

"Blackwood's assertion on 3/7/07 is contradicted by her job description which indicates lower end of medium exertion level and Blackwood's statement is her appeal letter. Preponderance of information in file clearly indicates that Blackwood's job was not sedentary. Her job description best

fits with "Nurse Head (DOT 075.137-014) and this occupation typically exists in the general economy at medium exertion level due to need to move, position and lift patients. With the exception of the preceding requirement, Blackwood's occupation generally requires light exertion due to frequent standing and walking required." (AR 94)

Robert Violetta, during his telephone conversation with Morse Doane on November 6, 2007, amended the report that he prepared on November 1, 2007. Whereas in the report he prepared on November 1, 2007, Violetta had concluded that CISLYN BLACKWOOD's job required **medium level exertion**, in the notes he prepared immediately after speaking with Morse Doane on November 6, 2007 Violetta concluded that her job only required "**light exertion**".

Although it is evident that Morse Doane attributed the statement in the SUN LIFE adjuster notes (AR 203) to CISLYN BLACKWOOD, the propriety of that self-serving interpretation is less than clear. Unlike the other statements contained in the adjuster notes that are specifically attributed to the claimant, the statement "Her manager position is sedentary. She does not lift or carry patients" is not specifically referenced as having been made by CISLYN BLACKWOOD. Plaintiff has denied that her job was sedentary or that she ever represented to anyone that she made such a statement. (AR 363)  Mr. Violetta even points out that Plaintiff's alleged statement is "contradicted by her job description". Logically, CISLYN BLACKWOOD would never have made such a statement as she knew only too well that she would occasionally need to be able to engage in the nursing duties indicated in her job description. (AR 94) CISLYN BLACKWOOD contends that the physical requirements of her job did indeed require her to engage in medium level exertion exactly as Mr. Violetta initially concluded.

CISLYN BLACKWOOD submits that regardless of whether one accepts Violetta's conclusion that the particular job requirements of CISLYN BLACKWOOD's job required her to be able to engage in **medium** level exertion or **light** level exertion, it is axiomatic that her job, in the opinion of SUN LIFE's own occupational analyst, required her to be able to engage in more than a **sedentary** level of exertion.

1 | IV.

2 | **PHYSICAL DISABILITY ANALYSIS**

3 | **1.    The Opinions of the Designated Medical Experts**

4 | Three doctors have expressed opinions as to whether CISLYN BLACKWOOD was

5 | medically disabled in August 2006 from engaging in her occupation as the manager of the

6 | Skilled Nursing Facility at Community Hospitals.

7 | Dr. Wittlinger submitted an Attending Physician Statement wherein he has indicated

8 | that CISLYN BLACKWOOD was suffering from a class 4 physical impairment level.

9 | Dr.Wittlinger indicated that CISLYN BLACKWOOD was suffering from a chronic ongoing

10 | condition which she had been suffering since 2001. Dr. Wittlinger specifically indicated in

11 | the APS that she was limited in her physical activities as follows: Sit 1-3 hours, Stand 1-4

12 | hours. Dr. Wittlinger also indicated in the APS that during the day the patient is able to

13 | Bend, twist, climb, push, pull, balance reach, grasp, kneel only "1-33%" of the time. Dr.

14 | Wittlinger concluded that CISLYN BLACKWOOD Employee "Cannot work 8 hour day" and

15 | was only "OK to work 2 hour day with restrictions." (AR 193)  It was the opinion of Dr.

16 | Wittlinger that CISLYN BLACKWOOD was limited by a "Class 4 Moderate limitation of

17 | functional capacity (60-70%) that limited her ability to work to "part time within limitations"

18 | and that she was not capable of working another occupation full/part time. (AR 193)

19 | Dr. Schneider concluded in his report of June 20, 2007 that CISLYN BLACKWOOD

20 | had the "functional capacity to perform full time sedentary work" and that her "neuropathy

21 | would not preclude full time sedentary work". (AR 314) Dr. Schneider makes no mention as

22 | to whether CISLYN BLACKWOOD was able to perform full time or part time medium or

23 | light work.

24 | Dr. Balducci prepared a report dated October 30, 2007. Dr. Balducci, at page 6,

25 | paragraph 11, of that report concluded that:

26 | "Throughout the medical records, there is support that
Ms. Blackwood could not have performed full time light work

27 | activity throughout and beyond the elimination period. Ms.
Blackwood could not have performed this full time light work

28 | activity including lifting, carrying, pushing and pulling 20
pounds occasionally and frequently up to 10 pounds due to

the fact that she has been sick for approximately five years with multiple myeloma and has been treated with aggressive chemotherapy and she was on continuous treatment with a drug that may have caused peripheral neuropathy. **Therefore, given the above-described findings, Ms. Blackwood could not have performed full-time light work activity throughout and beyond the elimination period of 08/16/06 though 11/13/2006, and thereafter.**" (Emphasis added) (AR 385)

Dr. Balducci was of the opinion that CISLYN BLACKWOOD could not perform full-time light work throughout and beyond the elimination period.     Although Dr. Balducci, following his telephone conversation with Morse Doane, later supplemented his report to add that he did not believe that Ms. Blackwood would not have been able to continue performing the same type of activities she had been performing before she stopped working, he never modified his opinion that "**Ms. Blackwood could not have performed full-time light work activity throughout and beyond the elimination period of 08/16/06 though 11/13/2006, and thereafter.**"

While Dr. Wittlinger alone has expressed the opinion that CISLYN BLACKWOOD is precluded from engaging in sedentary work, both Drs. Wittlinger and Balducci have expressed the opinion that CISLYN BLACKWOOD was disabled in August 2006, and throughout the elimination period, from engaging in any occupation that required medium or even light exertion. Dr. Schneider has only stated the opinion that he believes CISLYN BLACKWOOD could have engaged in full time sedentary work, Dr. Schneider has not expressed any opinion as to whether CISLYN BLACKWOOD could have engaged in work that required light or medium level exertion.

2.     **Balducci and Schneider Failed to Address the APS**

Dr. Wittlinger submitted an Attending Physician Statement wherein he indicated that CISLYN BLACKWOOD was suffering from a class 4 physical impairment level. Dr.Wittlinger indicated that CISLYN BLACKWOOD was suffering from a chronic ongoing condition which he had been suffering since 2001. Dr. Wittlinger specifically indicated in the APS that she was limited in her physical activities as follows: Sit 1-3 hours, Stand 1-4 hours. Dr. Wittlinger also indicated in the APS that during the day the patient is able to Bend, twist, climb, push,

1  pull, balance reach, grasp, kneel only "1-33%" of the time. Dr. Wittlinger concluded that

2  CISLYN BLACKWOOD "Cannot work 8 hour day" and was only "OK to work 2 hour day

3  with restrictions". (AR 192) It was the opinion of Dr. Wittlinger that CISLYN BLACKWOOD

4  was limited by a "Class 4 Moderate limitation of functional capacity (60-70%) "that limited

5  her ability to work to "part time within limitations" and that she was not capable of working

6  another occupation full/part time. (AR 192 at AR 193)

7      The AR reflects that both Dr. Schneider and Dr. Balducci failed altogether to address

8  the opinions expressed by Dr. Wittlinger in the Attending Physician Statement that he

9  submitted. [7] While Plaintiff recognizes that the opinions of the treating physicians are not

10  controlling on the PLAN, it is also true that the PLAN cannot simply ignore those opinions.

11          Here, there is no indication why the Plan, Dr. Reddy, and Dr.
            Berman disregarded Dr. Hauptman's opinion. In fact, it does
12          not appear the reviewing doctors even considered this opinion.
            The failure to even address Dr. Hauptman's report is evidence
13          of arbitrary conduct. The Plan relied on the most recent
            opinions of its own physicians without even addressing the
14          countervailing opinions of Dr. Lutz and Dr. Hauptman. This
            factor tends to support a finding of abuse of discretion.
15
            *Beckstrand v. Elec. Arts Group Long Term Disability Ins. Plan,*
16          2008 U.S. Dist. LEXIS 83195 (E.D. Cal. Sept. 16, 2008)

17      CISLYN BLACKWOOD submits that the decision to deny her long term disability

18  benefits based on reports of Drs. Schneider or Balducci that ignored the opinions expressed

19  by Plaintiff's primary treating physician cannot have been correct.

20  **3.    Drs. Balducci and Schneider Were Not Provided Complete Medical Records**

21      The medical records of CISLYN BLACKWOOD between 1/2001 and 12/2005 show

22  that she repeatedly reported to her doctors that she was suffering pain in all of her joints

23  including her neck, back, hips, knees and ankles. She also repeatedly reported to her doctors

24  that her cancer caused her to experience symptoms of fatigue, generalized weakness and

25  extreme swelling. (Blackwood Suppl. 119, 5-6, 7-9, 203, 19, 20, 22, 25, 33-35, 40-41, 43-44,

26  45, 175-177, 178-180, 59, 62, 63, 64, 67, 190-191, 91-92, 213) Unfortunately, neither Dr.

27

28
_____

[7] The AR actually reflects that Dr. Balducci was never provided a copy of the APS prepared by Dr. Wittlinger. (AR 385 paragraph 10)

_____

1  Schneider nor Dr. Balducci were provided any of Plaintiff's medical records that pre-date
2  2006.

3      SUN LIFE and their doctors based their determination that CISLYN BLACKWOOD
4  was not disabled largely on their finding of "no marked change in her condition". (AR 313 at
5  AR314-315) It is unreasonable for a doctor to assume that a person diagnosed with multiple
6  myeloma would be unchanged 5 years after the date of diagnosis, given that the average life
7  expectancy of a person suffering from multiple myeloma is 3 years from date of diagnosis.
8  This finding is only possible when one ignores the nature of the cancer that CISLYN
9  BLACKWOOD was suffering that resulted in her progressive deterioration and when one is
10 not provided any medical records from which to determine her base line condition.

> Sun Life's experts, including Dr. O'Connor, Dr. Himber, Dr.
> Pies and Dr. Sarni, largely agreed with the diagnoses, but
> discounted the effect they had on DeLisle's ability to work. In
> addition, Dr. O'Connor and Dr. Johnston noted that DeLisle
> did not complain of neuropsychological or cognitive
> impairments until after she was fired. And Dr. Corzatt pointed
> out that Dr. Ho had not imposed restrictions on DeLisle's
> ability to work. Although Sun Life does not owe special
> deference to the opinion of DeLisle's treating physicians, see
> Black & Decker, 538 U.S. at 834, it may not arbitrarily ignore
> them. Glenn, 461 F.3d at 671. Notably, Sun Life's medical
> professionals found support in DeLisle's medical records for
> the disorders described above, but discredited the date of
> disability on the basis that the records did not demonstrate a
> change in condition around April 17. None of Sun Life's
> reviewers confront Dr. Ho's characterization of the
> "progressive nature of her medical conditions," which would
> not manifest itself by a "significant change" on a particular
> date. And, as noted above, it is unclear whether Sun Life's file
> reviewers knew of the Social Security determination of total
> disability, or were unfairly swayed by communications from
> Sun Life's in-house attorney. On this record, we find that the
> entirety of the medical evidence available to Sun Life was not
> reviewed in a "deliberate" or "principled" fashion, which is a
> factor suggesting that Sun Life's ultimate determination was
> arbitrary.
>
> *Delisle v. Sun Life Assur. Co., 2009 U.S. App. LEXIS 4251 (6th
> Cir. Mich. 2009)*

26     The conclusion that CISLYN BLACKWOOD demonstrated no marked changes is also
27 based on an erroneous interpretation of certain the notations in the limited medical records
28 of Dr. Wittlinger that the SUN LIFE doctors reviewed.  Although Dr. Wittlinger did use the

terms "stable" and "asymptomatic" in his notes, he intended these terms to relate to a very specific set of medical conditions. Neither Dr. Schneider nor Dr. Baldcucci had any way of knowing what Dr. Wittlinger intended by his use of the terms "stable" and "asymptomatic".

> I periodically use the terms "stable" and "asymptomatic" in my medical records pertaining to Cislyn Blackwood. These terms were meant by me to indicate that there had been no acute deterioration in her cancer (no fever, no pneumonia, no bleeding) between the date of that visit and her last visit with me.

(AR-Declaration of Dr. Peter Wittlinger, paragraph 5)

The failure of SUN LIFE to provide either Dr Schneider or Dr. Balducci with any of Plaintiff's medical records that pre-date 2006 calls into question the value of their entire evaluation. CISLYN BLACKWOOD submits the decision to deny her long term disability benefits based on the reports of doctors who were not provided 4 years of medical records from Plaintiff's primary treating physicians cannot have been correct.

## 4.    State Disability Benefits

The PLAN requires participants to apply for any other disability benefits (Other Income Benefits) to which the participant may be eligible. (AR 18) In the event that the participant recovers any Other Income Benefits, SUN LIFE claims an offset of those amounts against what they owe under the PLAN to their participant. (AR 18)

SUN LIFE was made aware of the fact that CISLYN BLACKWOOD was recovering disability benefits from the State of California. (AR 207 at AR 210, Paragraph E) The fact that CISLYN BLACKWOOD was recovering State Disability benefits is a factor that the administrator should have considered in the evaluation of whether CISLYN BLACKWOOD was disabled. SUN LIFE denied Plaintiff's disability claim without ever taking into consideration the fact that the State of California had determined that she was eligible.

> 67. In 2003, the Supreme Court held that whether or not a claimant was awarded SSDI benefits was not directly relevant in assessing his entitlement to disability benefits under an ERISA plan. See *Black & Decker Disability Plan v. Nord, 538 U.S. at 833* ("In determining entitlement to Social Security benefits, the adjudicator measures the claimant's condition against a uniform set of federal criteria. '[T]he validity of a claim to benefits under an ERISA plan,' on the other hand, 'is likely to turn,' in large part, 'on the interpretation of terms in the plan at issue,'" quoting *Firestone, 489 U.S. at 115*).

Following *Black & Decker,* the Ninth Circuit has recognized the "inappropriateness of importing Social Security rules into the ERISA context." *Jordan v. Northrop Grumman Corporation Welfare Benefit Plan, 370 F.3d at 869.*

68. Despite the Court's holding in Nord, some courts continue to consider the incongruity of requiring a claimant to apply for SSDI benefits, on the one hand, and finding that he is not disabled, on the other. The Sixth Circuit, for example, has held that such a juxtaposition "counsel[s] a certain s[k]epticism of a plan administrator's decision-making." *Calvert v. Firstar Finance, Inc., 409 F.3d 286, 295 (6th Cir. 2005).* In *Calvert,* a plan administrator denied Calvert's claim without considering the fact that he had been awarded SSDI benefits. It did so despite the fact that it had required him to apply for such benefits and had "benefitted from the SSA determination by seeking and receiving reimbursement from Calvert for a portion of the payments it previously made to Calvert." Id. at 294. The court stopped short of holding that an administrator in such a situation is estopped from disagreeing with the finding of disability inherent in the SSDI award. Id. at 295 ("[T]he SSA's disability determination does not, standing alone, require the conclusion that Liberty's denial of benefits was arbitrary and capricious"). Rather, it stated, "[t]he SSA determination to award benefits to Calvert [was] . . . just one factor the Court should consider, in the context of the record as a whole, in determining whether Liberty's contrary decision was arbitrary and capricious." Id. Stated differently, "[h]aving benefitted financially from the government's determination that [the claimant] was totally disabled, [the administrator] obviously should have given appropriate weight to that determination." *Glenn v. MetLife, 461 F.3d 660, 669 (6th Cir. 2006);* see *Leffew v. Ford Motor Co., 258 Fed. Appx. 772, 2007 WL 4443520, *7 (6th Cir. 2007)* (Unpub. Disp.) ("[W]hen a plan administrator requires a claimant to pursue social security disability to reduce the amount of benefits due under the plan, the SSA's determination of disability should not be ignored in determining disability under the plan").

69. Both *Glenn* and *Calvert* cite a pre-*Nord* Seventh Circuit decision by Judge Posner, which held that "a decision by a plan administrator to seek and embrace an SSA determination for its own benefit, and then ignore or discount it later, 'casts additional doubt on the adequacy of their evaluation of . . . [a] claim, even if it does not provide an independent basis for rejecting that evaluation.'" *Calvert, 409 F.3d at 294-95* (quoting *Ladd v. ITT Corp., 148 F.3d 753, 756 (7th Cir. 1998)).* While these decisions are not binding for a variety of reasons, the logic underlying them is instructive.

70. While the Ninth Circuit has not addressed the question, a court within the circuit has recognized that, where an administrator requires that the claimant apply for, and benefits from an SSDI award, its "denial of benefits under such circumstances may be deemed 'inconsistent,'[ ], and may 'cast additional doubt on the adequacy of [the plan's] evaluation of

[the plaintiff's] claim.'" *Moskowite v. Everen Capital Corp., No. C 03 4666 MMC(MED), 2005 U.S. Dist. LEXIS 20842, 2005 WL 1910941, *4 n. 5 (N.D. Cal. Aug. 10, 2005).* The court agrees. The fact that UNUM did not consider Ratkovic's SSDI award is not alone sufficient to find that UNUM abused its discretion because, as the Ninth Circuit noted in Jordan, the Nord Court emphasized the differing standards of disability used in the Social Security and ERISA plan contexts. Here, however, the court has already determined that UNUM's review of Ratkovic's claim was inadequate. The fact that UNUM required Ratkovic to apply for SSDI benefits, and calculated a substantial overpayment (which it seeks to collect on NGC's behalf) when benefits were awarded, of NGC) "casts additional doubt" on its decision to deny Ratkovic benefits under the ERISA plan, and reaffirms and supports the court's conclusion that it abused its discretion in this case.

*Ratkovic v. Northrop Grumman Corp. Emple. Welfare Benefit Plan, 2009 U.S. Dist. LEXIS 13862 at pages 37-41 (C.D. Cal. Feb. 20, 2009).*

California SDI uses the same definitions of disability as the Social Security Administration, paraphrased as follows - inability to perform any substantially gainful activity because of a medically determinable physical or mental impairment that must be expected to last for more than twelve months or result in the applicant being deceased. CISLYN BLACKWOOD submits that the fact that she did recover disability benefits from the State of California is a factor that should be taken into consideration by the court in its evaluation of whether she was entitled to recover benefits under the PLAN since she will be required to offset whatever amounts she recovers from SDI or SSDI.[8]

Here, the PLAN similarly benefitted from the Social Security Administration's finding of a disability and similarly failed to address the State of California's finding that CISLYN BLACKWOOD was totally disabled.

CISLYN BLACKWOOD submits that the decision to deny her long term disability benefits without any attempt by SUN LIFE to address the fact that she determined to be eligible to recover SDI, cannot have been correct.

---

[8] CISLYN BLACKWOOD was specifically informed by SUN LIFE that she should hold off on applying for SSDI until after her long term disability benefits were set up. (AR 207 at AR 210, paragraph D) CISLYN BLACKWOOD questions whether the reason for this advice was so that SUN LIFE would not have to explain why she was held eligible for SSDI while SUN LIFE denied her claim.

**5.     SUN LIFE Use of Improper Standard**

The decision by SUN LIFE to deny the disability claim of CISLYN BLACKWOOD was based, in large part, on the "clarification" that Dr. Balducci expressed on November 6, 2007 during his telephone conversation with SUN LIFE adjuster Morse Doane. The letter written by Morse Doane dated November 6, 2007 (AR 409) summarizes her conversation with Dr. Balducci. Dr. Balducci, during his conversation with Morse Doane, stated that because he did not see anything in her records to indicate any change in her condition that there was no medical reason why CISLYN BLACKWOOD could not have continued performing the same type of activities she had been performing before she stopped working.  The essential question, contrary to the opinion of Morse Doane, was not whether there was "any medical reason Ms. Blackwood would not have been able to continue performing after she stopped working the same type of activities she had been performing before she stopped working?" but rather whether she was medically disabled from performing the duties of her occupation. In this critical regard, it is significant to note that Dr. Balducci did not modify the opinion he expressed in his report of October 30, 2007 that CISLYN BLACKWOOD **could not perform light** work.

The fact that CISLYN BLACKWOOD had worked up through the date that she stopped working is not a proper basis for determining if someone is disabled:

> A plan administrator may not find an individual not disabled because she worked despite suffering from a disability. Hawkins v. First Union Corporation Long-Term Disability Plan, 326 F.3d 914, 918 (7th Cir. 2003). However, it is not inappropriate to contrast an employee's symptoms throughout her employment history, especially when there is no documented change indicating her symptoms have now become so severe as to preclude her from working. Without using Ms. Jefferson's employment history as a reference point, nothing would be known about the range of her chronic headaches, including their severity and frequency over a given time period. Regence did not find that Ms. Jefferson was not disabled because she was able to work despite her chronic headaches. Rather, Regence found that during her employment history there was no documented change in the frequency or severity of her headaches, noting that she worked despite suffering from her chronic migraines. Regence found her not

disabled based on the medical evidence. Ostrom Decl., Ex. 10 at 4.

Nevertheless, the Court notes that MET's denial of benefits, based at least in part on the fact that Mitchell was "still working," is in tension with its argument that Mitchell needed to be unable to perform regular job functions. HN14The fact that a person is "still working" does not settle whether that person is able to perform regular job functions. See, e.g., Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 918 (7th Cir. 2003) v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 918 (7th Cir. 2003). Here, while Mitchell attended work on a full-time basis, substantial evidence indicates that he was unable to perform regular job functions. That MET appears to have equated being at work with being able to perform regular job functions indicates its flawed approach to evaluating Mitchell's claim. Mitchell's physicians and supervisor attested to the significant work impairment associated with his medical conditions. MET's reliance on Mitchell's continued attendance at work, as well as the noted problems with the objective evidence requirement, do not satisfy the Court that MET properly considered whether Mitchell was able to perform regular job functions. Accordingly, even under the more stringent policy definition of disability, the Court holds that MET abused its discretion by denying that Mitchell was disabled.

*Mitchell v. Metro. Life Ins. Co., 523 F. Supp. 2d 1132, 1148 (D. Cal. 2007)*

CISLYN BLACKWOOD repeatedly informed SUN LIFE that her condition had been progressively getting worse. (AR 207, 362, AR 93, Note of 11/08/07)[9] CISLYN BLACKWOOD submits that the opinion that Dr. Balducci offered during his telephone call with Morse Doane should have been ignored and not taken into consideration in any evaluation of her disability status.   CISLYN BLACKWOOD submits that the decision by SUN LIFE to deny her long term disability benefits based on the fact that she had working up through the date that she stopped working cannot have been correct.

---

[9] CISLYN BLACKWOOD also informed SUN LIFE that in 2001 when she had first been diagnosed with cancer that she had continued to work "even though her doctors had wanted her to stop working at that time but because of her work ethic, she had made an agreement with the State Disability Office to be off work for two weeks and then work for two weeks". (AR 211 at paragraph E)

1

2                                          V.

3                          **COGNITIVE IMPAIRMENT ANALYSIS**

4        CISLYN BLACKWOOD repeatedly informed SUN LIFE that she was suffering from

5   memory loss and difficulty retaining new information that left her unable to carry out her job

6   duties. (AR 197, 203, 209, 212 and 363)

7                I have had pain, peripheral neuropathy and fatigue prior to my
                 diagnosis. It has gotten worse over the years and significantly
8                so this past year.   You state I did not have worsening of my
                 condition immediately before and after beginning medical
9                leave.  The side effects of the medications plus the ongoing
                 effects of the cancer began to take a toll on my system
10               mentally and physically even affecting my attention span and
                 my memory.  I had to keep notes of everything I needed to do
11               and even then I would forget to look at the notes, therefore,
                 forgetting important things I needed to do.  One needs to be
12               alert when people's life and welfare rest on the decisions you
                 make.  With all that was happening in my life I knew it was
13               time for me to get out.  The symptoms progressively got worse
                 and got to a point where I could no longer function.  I needed
14               pain mediation to go to work and that worked against me
                 because I have to drive and stay awake at work in order to
15               function. (AR 362 at 363)

16       CISLYN BLACKWOOD even offered SUN LIFE her opinion that it was the steroids

17  that she was taking that were impairing her ability to retain new information and memory.

18  (AR 197, 208)

19               The claimant used to enjoy reading a lot more than she does
                 now, as she reported that the steroids and medication affect
20               her mental abilities. (AR 208)

21       During the course of a face-to-face interview with CISLYN BLACKWOOD conducted

22  on March 3, 2007, the SUN LIFE investigator recorded what could only be described as

23  evidence as to impaired cognitive functioning.

24               Mental Capacity:  The claimant seemed to comprehend the
                 questions, but at times seemed to lose her train of thought and
25               would ask things such as, "What was the question again?"  It
                 was often necessary to repeat questions during the course of
26               this interview.   She commented several times that her
                 medications "mess up her brain" and they reduce her critical
27               thinking and make her forgetful." (AR 000210 ¶5 D)

28

1    Robert Violetta, the SUN LIFE occupational analyst, concluded in his November 1,

2  2007 report, that the job that CISLYN BLACKWOOD held required her to be able to engage

3  in certain significant cognitive functioning.

> "In terms of cognitive requirements, Ms. Blackwood's
> occupation requires the ability to sustain close attention and
> concentration, learn and retain new information, oral and
> written comprehension and expression, process information
> quickly, make judgments and decisions, interpersonal skills,
> ability to work to great precision, multitask and perform
> effectively under stress responding to resident emergencies and
> to ensure patient safety."
> (AR 389-390)

9    Although the occupational analysis conducted by Robert Violetta concluded that the

10  job that CISLYN BLACKWOOD held required her to be able to engage in certain significant

11  cognitive functioning, SUN LIFE never conducted any analysis into whether CISLYN

12  BLACKWOOD was suffering any cognitive impairment throughout the elimination period.

13  The only time that any doctor retained by SUN LIFE even addressed the issue of whether

14  CISLYN BLACKWOOD was suffering from any cognitive impairment was Dr. Balducci in his

15  report of October 30, 2007. (AR 384) Dr. Balducci concluded that he did not believe that

16  CISLYN BLACKWOOD had a cognitive impairment that would preclude her from working. It

17  is crucial to recognize the limitation of that conclusion, however. Dr. Balducci described the

18  basis of his opinion as follows:

> There is no mention in the notes of Dr. Wittlinger of her
> cognitive condition.  Dr. Singh did a fairly careful cognitive
> exam at the time and there was no evidence of any cognitive
> impairment or sedation from any medication or combination of
> medications Ms. Blackwood is utilizing.  (AR 384)

22    Dr. Balducci indicates that his opinion is also based on the "fairly careful cognitive

23  examination" that Dr. Singh performed. This "fairly careful cognitive examination" was in

24  actuality nothing more than CISLYN BLACKWOOD having been asked a few simple

25  questions. (AR 375)

26    Dr. Balducci, as has already been discussed, was only provided a limited portion of

27  the Plaintiff's medical records and was never given the opportunity to examine the Plaintiff's

28  earlier medical records pre-dating January 2006. It is unknown whether he would have

1  offered his opinion as to the absence of any cognitive impairment if he had been told of the

2  two instances of cognitive problems that were recorded in Plaintiff's medical records.

3  (Blackwood Suppl. 29, 30) Dr. Balducci indicates that his opinion is also, in part, based on

4  the absence of any reference in the records of Plaintiff's oncologist of any cognitive

5  impairment or sedation from the medication or combination of medications that she was

6  then using. Dr. Balducci assumes that Dr. Wittlinger would include mention of cognitive

7  impairment in his records. CISLYN BLACKWOOD submits that Dr. Balducci ignored

8  altogether the question of whether the cancer medications that she was then taking

9  (Thalidomide and Decadron) could have caused the cognitive difficulties about which

10  CISLYN BLACKWOOD was complaining.

11      The court should also note that when Dr. Singh first examined CISLYN

12  BLACKWOOD on August 10, 2007, the elimination period had long since lapsed. All of the

13  doctors, including Dr. Balducci, agree that that of April 2007, CISLYN BLACKWOOD was

14  severely impaired due to her peripheral neuropathy and unable to perform even full time

15  sedentary activities. (AR 361, 380, 385, paragraph 10)

16      It is also critical to note that the August 10, 2007 report by Dr. Singh on which Dr.

17  Balducci relies (AR 373) is dated almost exactly one year after CISLYN BLACKWOOD

18  stopped working and specifically states that CISLYN BLACKWOOD had stopped taking the

19  very cancer medications (Thalidomide and Decadron) that she had asserted were causing the

20  cognitive impairment. (AR374) CISLYN BLACKWOOD has to question what weight should

21  be given to the opinion of Dr. Balducci as to the Plaintiff's cognitive impairment when the

22  record on which Dr. Balducci relied to form his opinion indicates that CISLYN

23  BLACKWOOD was no longer taking the steroids that she believed to have been causing her

24  the cognitive impairment.

25      CISLYN BLACKWOOD informed SUN LIFE of her subjective belief that the

26  medications were impairing her cognitive functions. Although CISLYN BLACKWOOD did

27  not submit objective medical confirmation that she was suffering from a cognitive

28

1  impairment, she was not required to do so.[10]  The PLAN specified did not require that

2  CISLYN BLACKWOOD submit objective evidence in support of her "Proof of Claim" merely

3  that she specify what the disability is, when it began and the cause of the disability. (AR 68)

4  The district court is permitted to consider subjective, as well as objective, evidence of

5  Plaintiff's disability. *Ray v. Unum Life Ins. Co. of Am., 224 Fed. Appx. 772, 787 (10th Cir.*

6  *Colo. 2007)* Following the denial by SUN LIFE of her claim in July 2007, CISLYN

7  BLACKWOOD, on August 7, 2007, again specifically informed SUN LIFE of the impact that

8  she believed the medications were having on her cognitive abilities. (AR 362 at 363)

9       The response by SUN LIFE to this assertion by CISLYN BLACKWOOD as to the

10  impact on her cognitive abilities that the cancer medications were having was to deny her

11  claim based solely on the evaluation performed by Dr. Balducci. The October 30, 2007

12  report of Dr. Balducci is the **only** medical evaluation SUN LIFE ever performed as to whether

13  CISLYN BLACKWOOD was suffering from the cognitive impairments she claimed. That

14  evaluation, as has already been discussed, was fundamentally flawed. Dr. Balducci did not

15  have all of the Plaintiff's medical records, assumed that an oncologist would include mention

16  of cognitive impairment in his records, did not address the question of whether the cancer

17  medications could cause the cognitive difficulties about which CISLYN BLACKWOOD was

18  complaining and relied on a report by Dr. Singh dated a year after CISLYN BLACKWOOD

19  stopped working and had stopped taking the very cancer medications that she had asserted

20  were causing the cognitive impairment.

21       It was incumbent on SUN LIFE to affirmatively respond to the subjective complaints

22  presented by CISLYN BLACKWOOD as to the impact the cancer medications were having

23  on her cognitive abilities.

24               In the present case, Liberty repeatedly asserts that Plaintiff's
25               complaints of pain are not sufficiently documented with
                 objective evidence. For example, Liberty states that "[i]t is not
                 an abuse of discretion or evidence of a conflict of interest for
26               Liberty to evaluate whether objective evidence, as opposed to

27  _____

28  [10] The existence of those cognitive impairments, however, were expressly noted during the face-to-face interview conducted by the SUN LIFE investigator on March (AR 207-211 at AR 210). Plaintiff's submits that those notations constitute objective confirmation of her complaints.

1
2
3
4
5

> plaintiff's subjective complaints of pain, supported his claim for disability." Def.'s Mot. at 17. Such a statement, however, is undermined by Saffon. Liberty may not ignore Plaintiff's subjective pain complaints and instead rely solely on objective evidence if evidence of Plaintiff's pain is not available. Given the not-insubstantial evidence of how Liberty's conflict of interest affected its decisions and the substantial evidence of Plaintiff's disability, the Court hereby finds that Liberty abused its discretion in denying Plaintiff disability benefits.

6
7

> *Prado v. Allied Domecq Spirits & Wine Group Disability Income Policy, 2008 U.S. Dist. LEXIS 4295 (N.D. Cal. Jan. 22, 2008)*

8
9
10

What we are left with are the repeated assertions by CISLYN BLACKWOOD of her subjective complaints of cognitive impairment weighed against the report of Dr. Balducci that failed to address the issue of cognitive impairment.

11
12
13
14
15
16
17
18
19
20
21
22
23
24

CISLYN BLACKWOOD repeatedly advised SUN LIFE of the cognitive impairments that she believed left her unable to return to work (AR 182, 196, 203, 209, 212, 366 and 343) and even advised SUN LIFE of her opinion that it was the steroids that she was taking that were the cause of her cognitive impairments. (AR 197, 208) The SUN LIFE investigator that conducted the interview of CISLYN BLACKWOOD on 3/8/07 through 3/12/07 noted that CISLYN BLACKWOOD believed the medications were affecting her cognitive abilities. (AR 207 at AR 209, paragraph D) SUN LIFE itself conducted an occupational analysis that verified that CISLYN BLACKWOOD was engaged in an occupation that required her to exercise significant cognitive functioning. (AR 388-391 at AR 389) Finally, none of the physicians retained by SUN LIFE to evaluate whether CISLYN BLACKWOOD was disabled, ever evaluated whether CISLYN BLACKWOOD was cognitively impaired during the elimination period or whether that impairment left her unable to continue working. The Administrative Record confirms that CISLYN BLACKWOOD met her burden to submit proof of a disability claim based on cognitive impairment.

25

### VI.

26

### LACK OF THOROUGHNESS OF DISABILITY EVALUATION

27
28

SUN LIFE had the express right under the PLAN to request that CISLYN BLACKWOOD submit to an examination by a "Physician, other health professional or

1   vocational expert of their choice."  (AR 31 at paragraph F) SUN LIFE elected not to ask

2   CISLYN BLACKWOOD to submit to either an IME or FCE. CISLYN BLACKWOOD submits

3   that such an examination would have eliminated many of the questions as to both her

4   physical disability and especially the cognitive impairments that she was suffering at the time

5   that she discontinued working in August 2006 and throughout the entire elimination period.

6   SUN LIFE chose to provide only portions of Plaintiff's medical records to their doctors for

7   them to consider in their evaluation of whether CISLYN BLACKWOOD was physically

8   disabled and their conclusions are necessarily suspect because of this. The only report that

9   even addresses the claim by CISLYN BLACKWOOD of cognitive impairment relies on an

10  examination of Plaintiff by a different doctor almost a full year after CISLYN BLACKWOOD

11  stopped working and after she had already stopped taking the medications that were causing

12  her cognitive impairments. It should also be noted that although SUN LIFE recognizes the

13  opinion of Dr. Singh that CISLYN BLACKWOOD was physically disabled by the date of that

14  August 2007 examination, that opinion is given no weight in their disability determination

15  because that examination fell outside the elimination period.

16      CISLYN BLACKWOOD submits that the "proof of claim" that she submitted

17  established that she was both physically and cognitively impaired from continuing to work.

18  CISLYN BLACKWOOD appreciates that SUN LIFE disputes the adequacy of the proof that

19  she submitted. CISLYN BLACKWOOD contends that any conflict in the sufficiency of the

20  proof of her disability should be weighed in her favor. SUN LIFE had the opportunity to

21  resolve questions as to the adequacy of her proof by having CISLYN BLACKWOOD submit

22  to examination. The failure of SUN LIFE to have conducted an IME or FCE within the

23  elimination period is a factor that the court should consider in evaluating whether CISLYN

24  BLACKWOOD has met her burden to establish that she was disabled in August 2006 and

25  throughout the elimination period.

26              However, "the failure to conduct a physical examination-
                especially where the right to do so is specifically reserved in
27              the plan-may, in some cases, raise questions about the
                thoroughness and accuracy of the benefits determination.
28              *Beckstrand v. Elec. Arts Group Long Term Disability Ins. Plan,*
                *2008 U.S. Dist. LEXIS 83195 (E.D. Cal. Sept. 16, 2008)*

VII

<u>CONCLUSION</u>

CISLYN BLACKWOOD submits that the decision to deny her long term disability benefits was incorrect based upon the evidence in the administrative record, as supplemented by the Court's Order of March 10, 2009 and the terms of the COMMUNITY HOSPITALS OF CENTRAL CALIFORNIA dba COMMUNITY MEDICAL CENTERS EMPLOYEE BENEFIT PLAN and SUN LIFE policy. CISLYN BLACKWOOD requests that this court enter a finding that she is entitled to all disability benefits that she was entitled to under the PLAN from August 16, 2006 through the present and continuing until such time as she is no longer disabled.

Dated:  March 30, 2009

**JACOBSON, HANSEN, NAJARIAN & McQUILLAN**
A Professional Corporation


By:_____/s/ Steven M. McQuillan_____
       STEVEN M. McQUILLAN, Attorneys for
       Plaintiff, CISLYN BLACKWOOD