1  LINDA CLAXTON, State Bar No. 125729
   linda.claxton@ogletreedeakins.com
2  ERIC MATHISEN, Indiana Bar No. 19475-71
   Eric.mathisen@ogletreedeakins.com
3  OGLETREE, DEAKINS, NASH,
   SMOAK & STEWART, P.C.
4  633 West Fifth Street, 53rd Floor
   Los Angeles, California 90071
5  Telephone:    (213) 239-9800
   Facsimile:    (213) 239-9045
6
7  Attorneys for Defendants
   SUN LIFE ASSURANCE COMPANY OF CANADA,
   SUN LIFE FINANCIAL, COMMUNITY HOSPITALS OF
8  CENTRAL CALIFORNIA dba COMMUNITY MEDICAL
   CENTERS EMPLOYEE BENEFIT PLAN
9

10              **UNITED STATES DISTRICT COURT**

11             **EASTERN DISTRICT OF CALIFORNIA**

12

13  CISLYN BLACKWOOD,                    | Case No. 1:08-CV-01822-AWI-DLB

14              Plaintiff,               | **DEFENDANTS' TRIAL BRIEF**

15      v.                               | Date:   April 28, 2009
                                         | Time:  9:00 a.m.
16  SUN LIFE ASSURANCE COMPANY OF        | Room:  2
17  CANADA, SUN LIFE FINANCIAL,
    COMMUNITY HOSPITALS OF
18  CENTRAL CALIFORNIA dba
    COMMUNITY MEDICAL CENTERS
19  EMPLOYEE BENEFIT PLAN and DOES
20  1-10,

21              Defendants.

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

3

Table of Authorities

I.      Introduction                                                                 3

II.     Statement of Facts                                                           4

        The LTD Policy                                                               4

        Blackwood's History and Claim for LTD Benefits                              7

        Blackwood's Appeal                                                          15

III.    Argument                                                                    19

        A.    Standard of Review                                                    19

        B.    Sun Life's Decision is Supported by the Evidence                      19

        C.    Sun Life's Decision to Deny Blackwood's Claim was Correct 26

        D.    Occupational Analysis                                                 30

        E.    Sun Life Properly Considered All of the Evidence                      31

        F.    Blackwood Did Not Properly Seek Treatment                             32

        G.    The Receipt of SSDI or Other Disability Benefits
              Is Not Relevant                                                       32

        H.    An IME Was Not Appropriate Given Blackwood's Delay       33

        I.    The Court Cannot Award More Than 24 Months of Benefits
              1.    The Court Can Not Award "Any Occupation" Benefits 33
              2.    Benefits for Blackwood's Conditions are Limited          36

IV.     Conclusion                                                                  36

DEFENDANTS' TRIAL BRIEF

1

2
TABLE OF AUTHORITIES

3
**Cases**

4
*Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 963 (9th Cir. 2006) ........................... 19

5
*Black & Decker Disability Plan* v. *Nord,* 538 U.S. 822, 123 S.Ct. 1965 (2003) ................. 26

6
*Farley v. Benefit Trust Life Ins. Co.,* 979 F.2d 653, 658 (8th Cir. 1992) ............................ 19

7
*Horton v. Reliance Standard Life Ins.  Co.,* 141 F.3d 1038,1040 (11th Cir. 1998.............. 19

8
*Jordan* v. *Northrop Grumman Corp. Welfare Benefit Plan, 370* F.3d 869 (9th Cir. 2003) 19,
9
   32

*Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan,* 46 F.3d 938, 943 (9th
10
   Cir. 1995) ................................................................................................................................. 19

11
*Pakovich v. Broadspire Services, Inc.,* 535 F.3d 601 (7th Cir. 2008) .................................. 34

12
*Patterson v. Hughes Aircraft Co.,* 11 F.3d 948 (9th Cir. 1993) ........................................... 35

13
*Peterson v. Continental Cas. Co.,* 282 F.3d 112 (2d Cir. 2002) .......................................... 34

14
*Prado v. Allied Domecq,* No. C-05-2716, 2008 WL 191985 (N.D. Cal. Jan. 22, 2008)...... 35

15
*Seman v. FMC Corp. Retirement Plan for Hourly Employees,* 334 F.3d 728, 733 (8th Cir.
16
   2003) ........................................................................................................................................ 35

*Silver v. Executive Car Leasing Long Term Disability Plan,* 466 F.3d 727, 733 (9th Cir.
17
   2006), citing *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan,* 46 F.3d
18
   938, 943 (9th Cir. 1995)......................................................................................................... 19

19
*Thomas v. Silgan Containers Corp.,* 2001 U.S. Dist. LEXIS 7088, *11 (9th Cir. 2001) .... 19

**Statutes**

20
Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001, et.
21
   seq. .................................................................................................................................. 3, 26

22

23

24

25

26

27

28

1

2                 **I. <u>INTRODUCTION</u>**

3        Cislyn Blackwood ("Blackwood") is a former employee of Community Hospitals of

4 California ("Community").   Blackwood alleges that Community sponsored an ERISA-

5 governed employee disability plan for its eligible full time employees, the benefits of which

6 were funded by a group long term disability policy ("Policy") issued by Sun Life Assurance

7 Company of Canada ("Sun Life").

8        Blackwood was diagnosed with multiple myeloma in 2001.  She continued working

9 in her same occupation from 2001 until August 15, 2006.  Blackwood made a claim for

10 long term disability benefits on January 30, 2007.   On July 2, 2007, Sun Life denied

11 Blackwood's claim under the Policy's own occupation definition on the grounds that she

12 was not totally disabled from her own occupation throughout the entire elimination period.

13 Blackwood appealed the decision.  Sun Life denied the appeal on November 8, 2007 on the

14 same basis.   Blackwood now seeks judicial review of the decision pursuant to section

15 1132(a)(1)(B) of the Employee Retirement Income Security Act of 1974, as amended, 29

16 U.S.C. §§ 1001, et. seq. ("ERISA").

17 //

18 //

19 //

20 //

21 //

22 //

23 //

24 //

25 //

26 //

27 //

28

DEFENDANTS' TRIAL BRIEF

## II. STATEMENT OF FACTS[1]

## THE LTD POLICY

■ The Policy issued to Blackwood's employer defined total disability as follows:

During the Elimination Period and the next 24 months, the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation.  After Total or Partial disability benefits combined have been paid for 24 months, the Employee will continue to be Totally Disabled if he is unable to perform with reasonable continuity any Gainful Occupation for which he is or becomes reasonably qualified for by education, training or experience. . . . To qualify for benefits, the Employee must satisfy the Elimination Period with the required number of days of Total Disability, Partial Disability or a combination of days of Total and Partial Disability. [R. 12]

■ Total disability benefits cease if the employee is no longer totally disabled or fails to provide proof of continued total disability.  [R. 20]

■ No long-term disability benefits are payable during the following periods:

1.      any period the Employee is not under the regular and continuing care of a Physician providing appropriate treatment in accordance with the disabling condition.

*          *          *          *          *

3.      any period of Total or Partial Disability due to Mental Illness, unless the Employee is under the continuing care of a specialist in psychiatric care. . . . Benefits after the first 24 months will only be payable if the employee is confined in a Hospital or Institution licensed to provide psychiatric treatment.

*          *          *          *          *

_____

[1] The administrative record has been Bates numbered SUN-BLACKWOOD 000001 – 000429 and has been filed by Blackwood's counsel.  References to the excerpts from the administrative record will be referred to as "R. __".  The additional documents ordered by the Court to be augmented to the administrative record have been Bates numbered Blackwood Suppl. 000001 – 000220 have been filed by Blackwood's counsel.  References to the excerpts from the augmented administrative record will be referred to as "RS. __".  Defendants will argue and brief this matter pursuant to the Court's March 10, 2009, Opinion and Order without waiver of any right of appeal and incorporate Defendants' Opposition to Plaintiff's Petition to Augment the Administrative Record as if fully set forth herein.  [Docket 24].

7.      any period of Total or Partial Disability due to Chronic Fatigue Illness, unless the Employee is under the continuing care of Physician providing appropriate treatment in accordance with the disabling condition. . . . Benefits after the first 24 months will only be payable if the Employee is confined in a Hospital or Institution.

8.      any period of Total or Partial Disability due to Musculoskeletal and Connective Tissue Illness, unless the Employee is under the continued care of a Physician providing appropriate treatment in accordance with the disabling condition . . .Benefits after the first 24 months will only be payable if the Employee is confined in a Hospital or Institution.

[R. 23-24]

■  Chronic Fatigue Illness means an illness that is characterized by a

debilitating fatigue in the absence of known medical or psychological conditions,

which includes but is not limited to:

| | | |
|---|---|---|
| a) | Chronic Fatigue Syndrome as supported by Center for Disease Control Guidelines | |
| b) | Chronic      Fatigue Immunodeficiency Syndrome as supported by Center for Disease Control Guidelines | |
| c) | Post Viral Syndrome | |
| d) | Limbic Encephalopathy | |
| e) | Epstein-Barr virus infection | |
| f) | Herpes virus type 6 infection | |
| g) | Myalgic Encephalomyelitis | |

Chronic Fatigue Illness does not include a disorder identified as a(n):

| | |
|---|---|
| a) | Neoplastic disorder |
| b) | Neurologic disorder |
| c) | Endocrine disorder |
| d) | Hematologic disorder |
| e) | Rheumatologic disorder |
| f) | Depression |

[R. 9]

//

//

■ **Mental Illness** means mental, nervous, emotional, behavioral,

psychological, personality, cognitive, mood or stress-related abnormality, disorder,

dysfunction or syndrome regardless of cause, including any biological or

biochemical disorder or imbalance of the brain.  Mental Illness includes, but is not

limited to, bipolar affective disorder, schizophrenia, psychotic illness, manic

depressive illness, depression and depressive disorders, anxiety and anxiety

disorders and any other mental and nervous condition classified in the Diagnostic

and Statistical Manual (DSM) of the American Psychiatric Association, in effect on

the date of Total or Partial Disability or a comparable manual if the American

Psychiatric Association stops publishing the (DMS). [R. 10]

■ **Musculoskeletal and Connective Tissue Illness** means a disease or disorder

of the neck and back and sprains and strains of joints and adjacent tissues, including

but not limited to:

| | |
|---|---|
| a) | Herniated, ruptured or bulging discs with neurological abnormalities that are documented by electromyogram and computerized tonography or magnetic resonance imaging |
| b) | Scoliosis that requires surgery |
| c) | Tumors, malignancies, or vascular malformation |
| d) | Radiculopathies that are documented by electromyogram |
| e) | Spondylolistheis, grade II or higher |
| f) | Myelopathies and myelitis |
| g) | Demyelinating diseases |
| h) | Traumatic spinal cord necrosis |
| i) | Osteopathies |
| j) | Rheumatoid or psoriatic arthritis |
| k) | Lupus |

[R. 11]

CASE NO. 1:08-CV-01822-AWI-DLB☐
DEFENDANTS' TRIAL BRIEF

## BLACKWOOD'S HISTORY AND CLAIM FOR LTD BENEFITS

■  During Blackwood's first visit with Dr. Wittlinger on September 25, 2001, Blackwood gave a history of having muscle weakness on and off for years.  She also had some intermittent numbness and tingling in her feet.  [RS. 136-137]

■  Blackwood was off work for approximately two weeks in October 2001, for the initial treatment of her multiple myeloma.  Thereafter, she was released to work with no restrictions other than a flexible work schedule.  [RS. 141]

■  Blackwood began working for Community in October 1995.  [R. 110]

■  Blackwood's myeloma was in remission for significant periods beginning in 2002.  [R. 272, 361; RS. 27, 58, 65]

■  Blackwood was also frequently noted to be asymptomatic and doing well.  [R. 263 – 264; RS. 27, 60-61, 65, 88, 96]

■  In April, 2002, Blackwood was doing quite well and offering no complaints.  [RS. 31]

■  Despite Dr. Wittlinger's notes that Blackwood was doing well and had minimal complaints in the Spring of 2002, she reported that her symptoms had not improved.  Dr. Laport indicated that, "It is not clear to me that they [other symptoms] are related to her myeloma since none of the symptoms appeared to improve after VAD chemotherapy."  [RS. 33-34]

■  Dr. Wittlinger did not think Blackwood's joint symptoms were related to her multiple myeloma when she was referred for a rheumatology consultation in November, 2002.  [RS. 53]

■ Blackwood was evaluated by Dr. Leyba on January 3, 2003.  Blackwood advised him that she continued to work, "because **her work is not entirely that physical** but she finds that she has easy fatigability to her arms and legs, much more so than she should have during normal daily activities."  She had no inflammation to her joints and took Darvocet.  Blackwood had normal range of motion of the cervical spine and shoulder.  There was no inflammation in the elbows, wrists or hands.  Muscle strength was 5/5.  Straight leg raising was negative with normal reflexes.  Muscle strength in the lower extremities was also 5/5.  Dr. Leyba could not find any signs of inflammatory process or significant deformity.  He could not correlate the complaints with Blackwood's multiple myeloma.  [RS. 175-177] (emphasis added)

■ Blackwood was seen by Dr. Sisson on February 18, 2003.  She was working as an administrating registered nurse at the time.  She had lost the numbness and tingling in her body, including the lower extremities.  Examination revealed good muscle bulk, strength, tone and coordination.  She performed rapid alternated movements well with her upper extremities and performed prolonged heel walking, toe walking, hopping, deep knee bends, tandem gait, and Romberg testing without difficulty.  She was able to perform single lower extremity deep knee bends while holding Dr. Sisson's hands for balance.  She had full range of motion of her lower back.  Straight leg raising was negative except for slight discomfort in the hip area at extreme range of motion.  Pinprick, light touch and vibration were all felt throughout her body.  He concluded that she had a history of probable connective tissue problems for many years.  She was improving and did not have more definitive neurological abnormalities beyond slight decrease to temperature sensation over

DEFENDANTS' TRIAL BRIEF

her feet.  [RS. 178-180]

■   Ultimately, Dr. Leyba had no diagnosis and sent her to Dr. Sisson, who found no evidence for any neurologic problem.  There was no apparent ideology for her complaints, and Dr. Leyba had nothing more to offer her.  [RS. 59]

■   During Blackwood's September 19, 2003, visit with Dr. Wittlinger, he noted that she had myalgias and arthralgias here and there, but they were not any worse than they had been.  [RS. 66]

■   She continued to hold steady in November, 2003, with some waxing and waning of musculoskeletal complaints of unclear ideology.  [RS. 67]

■   In June, 2004, Blackwood was "really doing remarkably well."  [RS. 36]

■   Blackwood reported chronic pain of 6/10 in her joints in August 2004.  [RS. 80]

■   Blackwood indicated that she was feeling pretty well except for stress about weight gain in February, 2005.  [RS. 85]

■   On June 24, 2005, Dr. Wittlinger again stated that Blackwood was "striking asymptomatic and doing well" and 'was responding beautifully."  [RS. 88]

■   On August 15, 2005, she reported "no complaints such as back pain."  [RS. 89]

■   Blackwood was asymptomatic and doing well in December 2005.  [RS. 96]

■   In the six months preceding the date Blackwood last worked, she was seen by Dr. Wittlinger seven times.  During those visits he noted that:

• February 3, 2006:  Blackwood was not newly symptomatic and had no bone pain.  [R. 273]

• March 3, 2006:   Blackwood was stable and her disease was in partial

CASE NO. 1:08-CV-01822-AWI-DLB☐

DEFENDANTS' TRIAL BRIEF

remission.  [R. 272]

- March 17, 2006:  Blackwood was doing well.  [R. 272]

- May 2, 2006:   Blackwood was tolerating her overall therapy for myeloma well.  [R. 269]

- May 23, 2006:   Blackwood did not have any significant bone disease **her strength and energy quite good** and she was offering no complaints.  [R. 268] (emphasis added)

- June 23, 2006:  Blackwood continued to look and feel well.  [R. 267]

- July 20, 2006:   Blackwood was doing well.  She had **modest peripheral neuropathy, but nothing she could not tolerate**.  [R. 267] (emphasis added)

■ One day **after** Blackwood's alleged date of disability, Blackwood was seen by Dr. Wittlinger and he noted that she was "really doing well.  She has **no bone pain, no acral dysesthesias of any great significance**, no rashes, no constipation or difficulties." [R. 266] (emphasis added)

■ One month after Blackwood stopped working, Dr. Wittlinger continued to state that Blackwood was "continuing to respond beautifully."  [R. 265]

■   In October 2006, Dr. Wittlinger confirmed that Blackwood was entirely asymptomatic and doing well.  [R. 264]

■   In December 2006, Blackwood was pretty much asymptomatic and had no elicitible boney tenderness.  [R. 263]

■ Blackwood saw Dr. Wittlinger approximately two weeks before making her long-term disability claim.  At that time, Dr. Wittlinger noted that she was stable, and having no

progression of her minimal acral dysesthesias or constipation and no skin rash.  [R. 262]

■   Blackwood submitted a claim for long-term disability benefits on or about January 30, 2007.  She provided a statement from her employer describing Blackwood's occupation.  Her job included about four hours of sitting, two hours of standing, and two hours of walking, with the ability to alternate positions.  She never had to climb, kneel, crawl/crouch, lifting was limited to five pounds and only occurred occasionally; carrying was also limited to five pounds and occurred frequently.  [R. 110-113, 190]

■   Blackwood's described her illness as "multiple myeloma, bone pain, generalized body weakness, joint pain, neuropathy, fatigue."  She did not include any description of cognitive or memory problems.  [R. 182]

■   Blackwood submitted an attending physician's statement from Dr. Wittlinger with her claim form.  The diagnosis was multiple myeloma with bone mets.  The attending physician's statement did not reference any cognitive or memory problems.  Despite the complete absence of any suggestion of disability or work restriction/limitations in his records, Dr. Wittlinger stated Blackwood's functional capacity was at the sedentary level.  He did not note any mental impairment on the attending physician's statement and indicated that he had not reviewed the material and substantial duties of Blackwood's occupation.  [R. 192-195]

■   On the next visit after completing his attending physician's statement, Dr. Wittlinger noted that Blackwood continued "to do well with a few acral dysesthesias secondary to neuropathy from the thalidomide."  [R. 261]

■  Sun Life contacted Community and was advised that Blackwood had not missed any

time prior to when she stopped working in August 2006.  [R. 107].

■    Sun Life began reviewing Blackwood's claim and sought an occupational analysis from its Senior Vocational Coordinator.  As part of the review, it was determined that Blackwood's DOT job title was Director, Nursing Service and was performed at the sedentary level.  [R. 178-181]

■    Sun Life's benefit consultant contacted Blackwood on March 7, 2007. Blackwood was always a manager and her manager position was sedentary.  She did not lift or carry patients.  She had treated with the same physician since being diagnosed with multiple myeloma. [R. 203-204]

■    Blackwood completed an employee history form for Sun Life and described her job duties.  Her normal job duties involved management and supervision.  She did not detail any significant lifting or carrying requirements.  [R. 212]

■    On March 30, 2007, Blackwood entered into a severance agreement with her former employer.  As part of the agreement, Blackwood acknowledged that she had received the reduction in force policy of January 9, 2006, and in consideration for the severance payment, Blackwood waived and released "any and all causes of action or claims arising out of or pertaining to my employment by the Released Employers or separation from my employment, including, but not limited to, any causes of action for claims based directly or indirectly upon . . . . .any other cause of action or claims, including those arising from or based upon any matter arising under the Employment Income Security Act of 1974 . . ." [R. 321-322]

■    In April 2007, Dr. Wittlinger discontinued Blackwood's medication for one

month due to increasing peripheral neuropathy. [R. 260]

■   Blackwood's medical information was reviewed by Registered Nurse Christine Entrekin on May 30, 2007.  All of the medical information and interviews of Blackwood were reviewed and considered.  Dr. Wittlinger documented the Blackwood was doing well with modest peripheral neuropathy but nothing that she could not tolerate.  Dr. Wittlinger documented that Blackwood was really doing well, had no bone pain, no acral dysesthesias of any great significance, no rashes, no constipation or difficulties.  The day after the disability date, Dr. Wittlinger did not document any problems with strength, weakness, fatigue or significant discomfort other than his noted increasing peripheral neuropathy on April 6, 2007.   The only medications for discomfort were Klonopin (neuropathic type symptoms) and Celebrex (arthritic type symptoms).  There was no indication of potent pain medications.  Nurse Entrekin concluded that the medical information did not identify a change in condition prior to the date of disability that would have caused a change in functional status as of August 16, 2006.  She further explained that:

- There was no indication immediately before, during or after the date of disability of any worsening of her reported symptoms, clinical findings or diagnostic values.

- There was a distinct difference between Blackwood's reports, the medical documentation, and the restrictions and limitations imposed by the physician.

- There was no indication of anemia that would account for fatigue/weakness.

- Strength and energy was noted as quite good on May 23, 2006, and fatigue was not documented in the clinical entries.

- There was no documentation of severe discomfort and no indication of the need for potent pain medications.

- Documentation for the physician visits one month before and one day after the date of disability did not indicate any problems or significant complaints.

- Contrary to Blackwood's complaints of leg swelling, there was no documentation of lower extremity edema.

- There was no documentation of cognitive difficulties from the mediations/therapy.  She had been taking Thalidomide and steroids consistently from January 2001 through April 2007, without any documented problems.

- The only indication of progression of symptoms was reported in Dr. Wittlinger's record of April 6, 2007.  Prior to that date, acral dysesthesias attributed to the Thalidomide were noted as minimal or modest.

- The restrictions and limitations set forth in Dr. Wittlinger's attending physician statement were not supported by his own medical documentation and the restrictions and limitations would not be supported from the date of disability through February 11, 2007.

[R. 343-345]

■  Sun Life sought a further medical opinion from Dr. Schneider, an independent physician who is Board Certified in Oncology.  Based upon information submitted by Blackwood and the vocational assessment, Dr. Schneider was asked about Blackwood's ability to perform sedentary work.  Dr. Schneider concluded that Blackwood had a slow

progression of symptoms from the mediation rather than from the myeloma itself.  She experienced progressive neuropathy from August, 2006 until April, 2007, when the Thalidomide was discontinued.  "There was no marked change in the claimant's condition, and she did not have the complete inability to sustain any level of activity prior to 8/16/2006 and for the period 8/16/2006 to the present."  She had the functional capacity to perform full-time sedentary work and there was no documentation of a need to rest every two hours.  [R. 314-315]

■   On July 2, 2007, Sun Life advised Blackwood that her claim for long-term disability benefits was denied.  She was advised that despite a history of myeloma, the medical evidence did not support total disability from her occupation.  [R. 351-357]

## BLACKWOOD'S APPEAL

■   Blackwood appealed Sun Life's decision by letter dated August 7, 2007. Blackwood denied receiving the reduction in workforce policy from her employer until after she had been off of work for six months.  She claimed that Dr. Wittlinger's notation that she was stable referred to being stable for someone living with the symptoms that she dealt with on a daily basis.  She was able to function and did not have to be hospitalized, but function for her was different from other people.  She alleged that if she did not take Klonopin for one day, her muscles shut down and that muscle weakness and difficulty had been the norm since she was diagnosed with myeloma.  She claimed that her pain, peripheral neuropathy and fatigue existed prior to her diagnosis of myeloma and became worse over the years, especially the past year.  The side effects of the mediation and the ongoing effects of the myeloma began to take a toll on her attention span and memory.

Blackwood claimed that her occupation was not sedentary and that it involved daily rounds of patients and attending various meetings.  Contrary to the forms she had previously submitted, Blackwood claimed that sometimes she had to cover for the nurses during their lunch breaks or fill-in during an emergency.  [R. 362-363]

■ Blackwood's appeal included a letter from Dr. Wittlinger dated July 31, 2007, indicating that Blackwood's myeloma had been in remission but was relapsing.  She was having painful peripheral neuropathy that limited her mobility and made it difficult for her to sit and walk.  The situation was **"certainly a change in her condition compared with just a few months prior and will be reflected in the medical records"** (emphasis added) [R. 361]

■ Blackwood later forwarded an initial evaluation report from her August 10, 2007 visit with Dr. Singh.  Dr. Singh performed a neurological exam and noted Blackwood's speech was fluent, there was no problem in naming of repetition.  She was able to recall month, year, date and day and the last three presidents.  She was able to calculate 100 by 7 and 3 places backwards.  She had immediate recall of 3/3 delayed of 1/3.  She was able to spell backwards.  Dr. Singh did not offer any opinions concerning Blackwood's work capacity or restrictions and limitations between August 2006 - February 2007. [R. 373-376]

■ Sun Life referred Blackwood's appeal to a benefit specialist and sought new medical and vocational reviews.  [R. 366]

■ Dr. Balducci, Professor of Oncology and Medicine and Board Certified in Oncology, Hematology and Internal Medicine, reviewed the file and provided his report of October 30, 2007.  Dr. Balducci opined that Blackwood was not functionally impaired by

her neuropathy from August 16, 2006 through November 23, 2006.   There was no laboratory documentation to show a progression of Blackwood's disease.   He further concluded that:

- There was no indication of any significant change in Blackwood's condition around the time she stopped working.

- There was no indication in Dr. Wittlinger's records of cognitive problems.   Dr. Singh performed a fairly careful cognitive exam and there was no evidence of any cognitive impairment.

- The medical data did not support the conclusion that Blackwood's level of impairment was as severe in August 2006 as it was one year later when seen by Dr. Wittlinger and Dr. Singh.

- From August 16, 2006 through November 13, 2006, Blackwood would have been able to perform full-time sedentary work activities including sitting most of the day, occasional walking and standing for brief periods and lifting up to 10 pounds occasionally.

[R. 382-387]

    ■   Dr. Balducci initially indicated that Blackwood would not have been able to perform light work throughout the elimination period.   Sun Life's benefits specialist spoke with Dr. Balducci to clarify and gain a better understanding of the opinion.   During the conversation, Dr. Balducci modified his opinion and agreed that the medical proof did not show any change in Blackwood's condition prior to the date she stopped working.   He further indicated that there "would be no medical reason she couldn't have continue to do

what she was doing; it was not until 4/07 that her records indicate that her condition began to worsen." Dr. Balducci confirmed the accuracy and agreement to the clarification by his signature on the letter from Sun Life's appeal specialist.  [R. 409-410]

■  A second occupational review was completed on November 1, 2007, by Robert Violetta.  He felt that Blackwood's occupation was best classified as head nurse that was performed at the medium exertion level with lifting, carrying, pushing, pulling 20-50 lbs. occasionally, 10-25 lbs. frequently, with frequent standing and walking.   The job classification also typically required frequent stooping and reaching.  [R. 388-391]

■  As a result of differences in the occupational reviews, Sun Life's appeal specialist spoke with Robert Violetta on November 6, 2007.   Mr. Violetta explained that if Blackwood's occupation did not involve the frequent need to move, position and lift patients, the occupation would generally require light exertion.  [R. 94]

■   Sun Life's appeal specialist spoke with Blackwood's former employer and learned that the facility where Blackwood worked had merged into a larger facility and was now closed. That merger began in 2006 and was completed in April 2007.  [R. 94]

■  Blackwood's appeal was denied by Sun Life's letter of November 8, 2007.

■   Dr. Schneider subsequently reviewed Dr. Wittlinger's July 31, 2007 letter, Dr. Singh's August 10, 2007 report, and the report of Dr. Balducci.  Dr. Schneider concluded that Blackwood was able to perform her duties as a manager, long term care until the middle of 2007.  He further concluded that Blackwood was able to perform her duties, including medium work, until April or May 2007.  [Exhibit A, p. 12 – July 1, 2008 Addendum]

1

2

## III. ARGUMENT

3

### A.        STANDARD OF REVIEW

4

The parties agree that this matter is governed by a *de novo* standard of review.

5

Under the *de novo* standard, the Court's task is to determine whether the claims decision

6

was correct. No analysis is required as to whether the claims administrator acted under a

7

conflict of interest. *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 963 (9th Cir. 2006).

8

Rather, the Court is required simply to undertake an independent and thorough inspection

9

of the administrator's decision. *Silver v. Executive Car Leasing Long Term Disability Plan,*

10

466 F.3d 727, 733 (9th Cir. 2006) citing *Mongeluzo v. Baxter Travenol Long Term*

11

*Disability Benefit Plan,* 46 F.3d 938, 943 (9th Cir. 1995).

12

Blackwood bears the burden of proving her entitlement to benefits. *See Thomas v.*

13

*Silgan Containers Corp.,* 2001 U.S. Dist. LEXIS 7088, *11 (9th Cir. 2001); *Farley v.*

14

15

*Benefit Trust Life Ins. Co.,* 979 F.2d 653, 658 (8th Cir. 1992); *Horton v. Reliance Standard*

16

*Life Ins.  Co.,* 141 F.3d 1038,1040 (11th Cir. 1998); *see also Jordan* v. *Northrop Grumman*

17

*Corp. Welfare Benefit Plan, 370* F.3d 869 (9th Cir. 2003).

18

### B. SUN LIFE'S DECISION IS SUPPORTED BY THE EVIDENCE

19

20

Pursuant to the terms of the Policy, Blackwood bears the burden of proving that she

21

was unable to perform the material and substantial duties[2] of her own occupation during the

22

23

entire 180-day elimination period (August 16, 2006 – February 17, 2007) and the next 24

24

months in order to recover long term disability benefits under the Policy's own occupation

25

26

27

28

_____
[2] Material and substantial duties means, but is not limited to, the essential tasks, functions, skills or responsibilities for the performance of the individual's own occupation. [R. 10].

DEFENDANTS' TRIAL BRIEF

1   definition.  [R. 4, 9, 12].

2       Blackwood worked for Community from October 1995 – August 16, 2006. [R. 110;

3   Fact A][3].  She was diagnosed with multiple myeloma in September 2001 and began

4   chemotherapy treatment.  [Fact E].  Blackwood gave a history of having muscle weakness

5   and intermittent numbness and tingling in her feet during her first visit with Dr. Wittlinger

6   in September 2001.  [RS. 136-137].  Blackwood was off work for approximately two weeks

7   in October 2001, during her initial treatment of her multiple myeloma.  Dr. Wittlinger

8   released Blackwood back to work just a couple months after her chemotherapy treatment

9   began with no restrictions other than a flexible work schedule.  [RS. 141].  Blackwood

10  continued working without missing any significant time until August 16, 2006.  [R. 107].

11  She continued treating with Dr. Wittlinger on a regular basis from 2001 until the present.

12  Blackwood responded well to the treatment and was noted to be in remission on several

13  occasions.  [R. 272, 361; RS. 27, 58, 65].  Dr. Wittlinger also routinely commented that

14  Blackwood was asymptomatic.  [R. 263 – 264; RS. 27, 60-61, 65, 88, 96].

15      Dr. Wittlinger did not think Blackwood's joint symptoms were related to her

16  multiple myeloma.  He referred her to Dr. Leyba for a rheumatology consultation in

17  November 2002.  [RS. 53].  Blackwood was evaluated by Dr. Leyba on January 3, 2003.

18  Blackwood advised him that she continued to work, "because **her work is not entirely**

19  **that physical** but she finds that she has easy fatigability to her arms and legs, much more

20  so than she should have during normal daily activities."  [RS. 175] (emphasis added).  Dr.

21  Leyba's exam revealed that Blackwood had normal range of motion of the cervical spine

---

[3] Undisputed facts from the parties' Joint Pretrial Statement are referred to as "Fact
__".

and shoulder.  There was no inflammation in the elbows, wrists or hands.  Muscle strength in the upper extremities was 5/5.  Straight leg raising was negative with normal reflexes. Muscle strength in the lower extremities was also 5/5. Dr. Leyba could not find any signs of inflammatory process or significant deformity.  He could not correlate Blackwood's complaints with her multiple myeloma.  [RS. 175-176].

Blackwood was seen by Dr. Sisson on February 18, 2003 because Dr. Leyba could offer no explanation for her complaints.  [RS. 59, 178].  She was working as an administrating registered nurse at the time.  **She had lost the numbness and tingling in her body, including the lower extremities.**  [RS. 178].  Dr. Sisson's exam revealed good muscle bulk, strength, tone and coordination.  Blackwood performed rapid alternating movements well with her upper extremities and performed prolonged heel walking, toe walking, hopping, deep knee bends, tandem gait, and Romberg testing without difficulty. [RS. 179 – 180].   She was able to perform single leg deep knee bends while holding Dr. Sisson's hands for balance.  She had full range of motion of her lower back.  Straight leg raising was negative except for slight discomfort in the hip area at extreme range of motion. Pinprick, light touch and vibration were all felt throughout her body.  Dr. Sisson believed that Blackwood had a history of probable connective tissue problems for many years with a great deal of fatigue and possible weakness.  She was improving and did not have any definitive neurological abnormalities beyond a slight decrease in temperature sensation over her feet.  [RS. 180].

On September 19, 2003, Dr. Wittlinger noted that Blackwood had myalgias and arthralgias here and there, but they were not any worse than they had been.  [RS. 66].  One

month later, Dr. Wittlinger commented that Blackwood continued to hold steady with some waxing and waning of musculoskeletal complaints of unclear ideology.  [RS. 67].  In August 2004, Blackwood complained to Dr. Jones about chronic pain in her joints.  [RS. 80].  By February 2005, Blackwood was feeling pretty well except for stress about weight gain.  [RS. 85].  Six months later, Blackwood reported "no complaints such as back pain." [RS. 89].  Blackwood did not receive any further referrals or treatment for her joint, muscle, and or fatigue complaints after August 2004 until she saw Dr. Singh in July 2007. There is no record of Blackwood receiving treatment for or complaining about cognitive or memory issues anytime after 2003.  As evidenced by Dr. Wittlinger's records, there were no significant changes in Blackwood's medication regimen for the few years before she stopped working.

Dr. Wittlinger noted that Blackwood continued to do remarkably well in the eight months before her alleged disability.  More specifically, Dr. Wittlinger's contemporaneous notes demonstrated that:

| | |
|---|---|
| 01/06/2006 | Myeloma remains under good control. |
| 02/03/2006 | She is not newly symptomatic and no bone pain. |
| 02/08/2006 | She will be going out of town on vacation. |
| 03/03/2006 | Stable in that monoclonal paraprotein spike not increased in last month.  **"The patient is stable and her disease is in partial remission on maintenance thalidomide, monthly Aredia and monthly pulses of dexamethasone."** |
| 03/17/2006 | She remains on Aredia and thalidomide and is doing well. |
| 03/30/2006 | Counts are adequate today. |

DEFENDANTS' TRIAL BRIEF

| 05/02/2006 | Tolerating overall therapy for myeloma well.  No lower extremity edema. |
| 05/23/2006 | Does not have any significant bone disease. **Strength and energy quite good**.  Offering no complaints. |
| 06/23/2006 | Continues to look and feel well. |
| 07/20/2006 | Doing well.  Modest peripheral neuropathy **but nothing she cannot tolerate**. |

[R. 267-269, 271-273, 275] (emphasis added.)

Remarkably, Blackwood was seen be Dr. Wittlinger **the day after she stopped working**.  There was no record of a discussion about Blackwood's work ability or her decision to stop working.  Blackwood did not complain of increased problems or of any inability to perform her occupation.  Dr. Wittlinger noted that she was "**really doing well,**" **had no bone pain, no acral dysesthesias of any great significance, no rashes, no constipation or difficulties.**  [R. 266] (emphasis added).  Dr. Wittlinger's documentation of Blackwood's good progress continued throughout the entire elimination period:

| 9/14/2006 | "It appears the patient is continuing to respond beautifully." |
| 10/12/2006 | **"She is entirely asymptomatic and doing well."** |
| 12/15/2006 | Remains "basically pretty much asymptomatic." "No elicitible boney tenderness." |
| 01/12/2007 | **"Really she is stable.  She is having no progression of her minimal acral dysesthesias or constipation and no skin rash.  She has multiple myeloma on therapy."** |
| 02/09/2007 | "She continues to do well with a few acral dysesthesias secondary to neuropathy from the thalidomide." |
| 03/13/2007 | No elicitble boney tenderness. |

[R. 260 – 265] (emphasis added).

There was never any mention in Dr. Wittlinger's records about Blackwood's

inability to perform her job or any other significant restrictions and limitations.   During the period from at least January 2006 – March 2007, Dr. Wittlinger failed to note any severe and debilitating fatigue, neuropathy, muscle pain, or weakness that Blackwood now claims led to her inability to perform her occupation.  To the contrary, he specifically documented that her strength and energy were good, there was no progression of her minimal dysesthesias, and there was no bone tenderness/pain or leg edema.  Dr. Wittlinger did not refer Blackwood to any specialists for complaints of fatigue, muscle pain and weakness, and neuropathy during the years before Blackwood stopped working.  Nor did he make any such referrals during the six month elimination period.   Blackwood did not seek any treatment for her alleged complaints during the six month elimination period.   Dr. Wittlinger only noted one occasion, in 2002, when Blackwood had an adverse reaction to her medication.  [RS. 29-30].   He never referred Blackwood for treatment of memory loss or cognitive problems.  The record evidence does not indicate Blackwood ever sought care or treatment for alleged memory and cognitive problems.

Dr. Wittlinger attempted to modify history by his attending physician statement, letters, and Declaration.  The attending physician statement completed by Dr. Wittlinger noted a diagnosis of myeloma with bone mets.  [R. 192].  The only subjective symptom noted was acral dysesthesias.  [Id.].  Blackwood had improved and was ambulatory.  [R. 193].  He did not indicate any mental impairment.  [R. 194].  He offered an opinion about her work ability without knowledge of the material and substantial duties of Blackwood's occupation.  [R. 195].

The opinions offered in the attending physician statement are simply not supported by Dr. Wittlinger's contemporaneous notes.  There can be no doubt that Dr. Wittlinger, like any other qualified physician, understood the importance of noting significant complaints, events, developments, and discussions in his chart.  In fact, in the distant past, he had noted when there were complaints of muscle pain, neuropathy, fatigue, and the like.  He had also made appropriate referrals when those issues arose.  Dr. Wittlinger would have surely noted

1    a change in condition significant enough to require Blackwood stop working.   Dr.

2    Wittlinger's notes were devoid of any reference to disabling conditions or symptoms during

3    the years before and six months after Blackwood stopped working.

4         It appears that by April 2007, Blackwood's condition had changed and Dr.

5    Wittlinger noted that because of peripheral neuropathy he was going to discontinue her

6    medication for one month.  [R. 260].  The April 2007 record further demonstrates that Dr.

7    Wittlinger would have recorded and acted upon any marked changes in Blackwood's

8    condition.  Dr. Wittlinger authored a letter dated July 31, 2007 in an effort to support

9    Blackwood with the appeal of her claim.  He stated that Blackwood was having painful

10   peripheral neuropathy that limited her mobility and made it difficult for her to sit and walk

11   which was "**certainly a change in her condition compared with just a few months prior**

12   **and will be reflected in the medical records"**.   [R. 361] (emphasis added).   Dr.

13   Wittlinger's letter confirmed that Blackwood's condition did not change or deteriorate until

14   a few months before his letter which was consistent with his chart notes that the problem

15   did not present itself until at least April 2007.  This change in condition was eight months

16   **after** Blackwood stopped working and well **beyond** the 180-day elimination period.

17        In a final attempt to advocate for his patient, Dr. Wittlinger executed a Declaration

18   wherein he stated, "At no time between September 2001 and December 2007 did I ever

19   express any opinion in my medical records as to Cislyn Blackwood's ability to continue

20   working and I never intended my records during that time period to address the issue of

21   whether she was disabled."  [Wittlinger Decl ¶. 7].  He is correct that he never expressed

22   any opinion in his records about Blackwood's work ability.  However, whether or not he

23   intended his records to be relied upon is immaterial.  His chart is the best available

24   contemporaneous evidence of Blackwood's condition.  The records were made at the time

25   of his treatment and would have included any relevant information.  Dr. Wittlinger's *post*

26   *hoc* attempts to change the facts are not persuasive and must be rejected.  The bias of

27   treating physicians like Dr. Wittlinger is one of the reasons the Supreme Court rejected the

28

treating physician rule in ERISA cases.  *See Black* & *Decker Disability Plan* v. *Nord,* 538 U.S. 822, 123 S.Ct. 1965 (2003). "A treating physician, in a close case, may favor a finding of 'disabled.'"  *Nord*, 538 U.S. at 832.  The opinions of Dr. Wittlinger are not entitled to more weight than the opinions of other medical experts consulted by Sun Life.  *Id*. at 822.  The evidence from Blackwood's own physicians demonstrates that she was not disabled from her own occupation on August 16, 2006 and for the next 180 days.

## C. SUN LIFE'S DECISION TO DENY BLACKWOOD'S CLAIM WAS CORRECT

Sun Life began its review of Blackwood's claim after receiving her claim forms. There were only two weeks left before the expiration of the elimination period when Blackwood first notified Sun Life of her claim.  [Fact F].  Sun Life promptly sent Blackwood the claim forms and they were received back on March 6, 2007.  [R. 106]. Blackwood's medical providers did not provide their records until May 2007.  [R. 102]. Blackwood described her illness as "multiple myeloma, bone pain, generalized body weakness, joint pain, neuropathy, fatigue."  She did not include any description of cognitive or memory problems.  [R. 182].  The form from the employer indicated that Blackwood's occupation included about four hours of sitting, two hours of standing, and two hours of walking with the ability to alternate positions.  She never had to climb, kneel, crawl/crouch. Lifting was limited to five pounds and only occurred occasionally.  Carrying was also limited to five pounds and occurred frequently.  [R. 110-113, 190].

During a conversation with Blackwood on March 7, 2007, Blackwood explained that she was always a manager and her manager position was sedentary.  She did not lift or carry patients.  [R. 203-204].  An occupational analysis was performed and it was determined that her occupation was best classified as Director, Nursing Service, a sedentary level job. [R. 178-181].  It was later learned that Blackwood entered into a severance agreement with Community on March 30, 2007 as part of a reduction in force.  As part of the agreement, Blackwood acknowledged that she had received the reduction in force policy of January 9, 2006.  In consideration for the severance payment, Blackwood waived

and released "any and all causes of action or claims arising out of or pertaining to my employment by the Released Employer's or separation from my employment, including, but not limited to, any causes of action for claims based directly or indirectly upon . . . . .any other cause of action or claims including those arising from or based upon any matter arising under the Employment Income Security Act of 1974 . . ." [R. 321-322].

Sun Life had Blackwood's medical information reviewed by a Registered Nurse and Board Certified Oncologist.  The nurse noted that the only medications for discomfort were Klonopin (neuropathic type symptoms) and Celebrex (arthritic type symptoms).  There was no indication of potent pain medications.  The medical information did not identify a change in condition prior to the date of disability that would have caused a change in functional status as of August 16, 2006.  More specifically, Nurse Entrekin explained that:

- There was no indication immediately before, during, or after the date of disability indicating any worsening of Blackwood's reported symptoms, clinical findings or diagnostic values.

- There was a distinct difference between Blackwood's reports, the medical documentation, and the restrictions and limitations imposed by the physician.

- There was no indication of anemia that would account for fatigue/weakness.

- Strength and energy were noted as quite good on May 23, 2006, and fatigue was not documented in the clinical entries.

- Documentation for the physician visits one month before and one day after the date of disability did not indicate any problems or significant complaints.

- Contrary to complaints of leg swelling, there was no documentation of lower extremity edema.

- There was no documentation of cognitive difficulties from the mediations/therapy.

She had been taking Thalidomide and steroids consistently from January, 2001 through April, 2007, without any documented problems.

- The only indication of progression of symptoms was reported in Dr. Wittlinger's record of April 6, 2007.  Prior to that date, acral dysesthesias attributed to the Thalidomide were noted as minimal or modest.

- The restrictions and limitations set forth in Dr. Wittlinger's attending physician statement were not supported by his own contemporaneous medical documentation and the restrictions and limitations would not be supported from the date of disability through February 11, 2007.

[R. 343-345].

The physician review by Dr. Schneider similarly concluded that "there was no marked change in the claimant's condition, and she did not have the complete inability to sustain any level of activity prior to 8/16/2006 and for the period 8/16/2006 to the present." She had the functional capacity to perform full-time sedentary work.   [R. 314-315]. Blackwood's claim that Dr. Schneider did not express any opinion as to whether she could engage in light or medium level work is not correct.  [Docket 34, p. 15].  Dr. Schneider's original report only expressed an opinion about sedentary work because that was the specific question he was asked.   However, as opposing counsel knows, Dr. Schneider subsequently reviewed Dr. Wittlinger's July 31, 2007 letter, Dr. Singh's August 10, 2007 report, and the report of Dr. Balducci.  Dr. Schneider concluded that Blackwood was able to perform her duties as a manager, long term care until the middle of 2007.  He further concluded that Blackwood was able to perform her duties, including medium work, until

April or May 2007.  [Exhibit A, p. 12 – July 1, 2008 Addendum].  Blackwood's counsel was provided with the Addendum report on or about July 2, 2008.

Sun Life denied Blackwood's claim based on the record evidence.  Blackwood appealed the denial, but did not submit any new evidence except for the July 31, 2007 letter from Dr. Wittlinger, *supra*, and the record from her initial office visit note with Dr. Singh on August 10, 2007.  Dr. Singh performed a neurological exam and did not find any deficits.  Dr. Singh did not offer any opinions concerning Blackwood's work capacity or restrictions and limitations during August 2006 through February 2007. [R. 373-376].

Sun Life sought a second vocational assessment and physician review during the appeal process.  Dr. Balducci, Professor of Oncology and Medicine and Board certified in Oncology, Hematology and Internal Medicine, reviewed the file and provided his report on October 30, 2007.  Dr. Balducci opined that Blackwood was not functionally impaired by her neuropathy from August 16, 2006 through November 23, 2006.  [R. 382].  There was no laboratory documentation to show a progression of Blackwood's disease.  Nor was there any indication of significant change in condition around the time she stopped working. [Id.].  Dr. Wittlinger's records did not note cognitive problems and a fairly careful cognitive exam performed by Dr. Singh did not reveal evidence of any cognitive impairment.  [R. 384].  The medical data did not support the conclusion that Blackwood's level of impairment was as severe in August 2006 as it was one year later when seen by Dr. Wittlinger and Dr. Singh.  [R. 384].  From August 16, 2006 through November 13, 2006, Blackwood would have been able to perform full-time sedentary work activities including sitting most of the day, occasional walking and standing for brief periods and lifting up to

1   10 pounds occasionally.  [R. 385].

2        Dr. Balducci initially indicated that Blackwood would not have been able to perform

3   light work.  Sun Life's appeal specialist spoke with Dr. Balducci to clarify and gain a better

4   understanding of the opinion.  After further considering the facts, Dr. Balducci modified his

5   opinion and agreed that the medical proof did not show any change in Blackwood's

6   condition prior to the date she stopped working.  He further indicated that there **"would be

7   no medical reason why she couldn't continue to do what she was doing; it was not

8   until 4/07 that her records indicate that her condition began to worsen."** [R. 409-410]

9   (emphasis added).

10

11       A second occupational review was completed on November 1, 2007, by Robert

12  Violetta.  He believed Blackwood's occupation was best classified as head nurse and was

13  performed at the medium exertion level with lifting, carrying, pushing, pulling 20-50 lbs.

14  occasionally, 10-25 lbs. frequently, with frequent standing and walking.   The job

15  classification typically required frequent stooping and reaching.  [R. 388-391].  As a result

16  of differences in the occupational reviews, Sun Life's appeal specialist spoke with Robert

17  Violetta.   Mr. Violetta explained that if Blackwood's occupation did not involve the

18  frequent need to move, position and lift patients, the occupation would be performed at the

19  light exertion level.  [R. 94].  Sun Life appropriately denied Blackwood's appeal because

20  the evidence did not support the claim of total disability.

21                          **D. OCCUPATIONAL ANALYSIS**

22       The Court will review this matter *de novo* and make its own determination about the

23  proper classification of Blackwood's occupation.  There is ample evidence to support the

conclusion that her job was sedentary, including:

- Blackwood's statement to Sun Life that her job was sedentary and that she did not need to lift or carry patients.  [R. 203-204].
- Blackwood's statement to Dr. Leyba that her job was not that physical.  [RS. 175].
- The Employer Statement indicating that her occupation only occasionally involved lifting five pounds and frequently involved carrying five pounds; never required climbing, kneeling, or crawling/crouching; and only occasionally required bending/stooping, pushing/pulling.  [R. 112].

The medical and expert evidence indicates that Blackwood was not disabled from her own occupation regardless of the job classification.  She had performed the same job for years without any absences or indication of work complaints.  There was no material change in her job duties or her medical condition and the experts agree that she was able to continue performing her job.

### E. SUN LIFE PROPERLY CONSIDERED ALL OF THE EVIDENCE

Blackwood contends that Sun Life and its medical experts failed to consider the opinions of Dr. Wittlinger.  A review of the evidence clearly rebuts the contention.  Sun Life and its medical experts considered and relied on the records from Dr. Wittlinger.  They simply disagreed with his opinion about Blackwood's disability because it was contradicted by his own records.

Sun Life did not have the opportunity to review the augmented record evidence because it was not provided by Blackwood during the claim process.  Nonetheless, an examination of the augmented evidence further supports Sun Life's decision.  As detailed above, Blackwood made complaints and sought treatment for fatigue, muscle pain, and neuropathy in 2001 – 2003.  The complaints were made and noted in Dr. Wittlinger's records.  Blackwood was able to perform her occupation even when she complained of said conditions.  The augmented records show that Blackwood did not complain of fatigue, muscle pain, and neuropathy in the last couple of years before she stopped working.  The

1  augmented records also clearly establish that Blackwood did not complain of memory loss

2  or cognitive problems after 2002.

3       In *Jordan* v. *Northrop Grumman Corp. Welfare Benefit Plan, 370* F.3d 869 (9th Cir.

4  2003), the Ninth Circuit recognized that the issue in a disability claim is not the existence

5  of a medical diagnosis. Rather, the critical issue is whether the medical diagnosis results in

6  a functional impairment that prevents a plaintiff from performing occupational duties as

7  defined by the policy. *Id.* at 880.  It is appropriate to require objective evidence to show that

8  Blackwood's medical condition actually precluded her performing work. *Id.* at 876-877.

9  Blackwood's subjective complaints were contrary to and not supported by the objective

10  medical findings.  In light of these facts, Sun Life was correct to reject Blackwood's

11  subjective claims.

12              **F. BLACKWOOD DID NOT PROPERLY SEEK TREATMENT**

13       The Policy precludes payment of long term disability benefits unless the claimant is

14  under regular and continuing care of a physician providing appropriate treatment for the

15  condition.  [R. 23 - 24].  Blackwood did not receive care and treatment from August 16,

16  2006 – February 17, 2007 for memory or cognitive problems.  To the extent Blackwood

17  bases her claim on alleged cognitive and memory problems, she is barred from recovery

18  due to her failure to seek regular and continuing care.

19
20     **G. THE RECEIPT OF SSDI OR OTHER DISABILITY BENEFITS IS NOT
            RELEVANT**

21       **W**hether or not Blackwood was awarded SSDI or California disability benefits has

22  no bearing on whether she is entitled to long term disability benefits under the Policy.

23
24  There is no information in the administrative record regarding what evidence was provided

25  to and gathered by the SSA or State of California.  Nor is there any information about the

26  rationale for any award of governmental benefits.  The SSA and State agencies must rely on

27  certain presumptions, like the treating physician rule, that are not applicable in this case.

28

*See Nord*, 538 U.S. 822.  The lack of information and differing presumptions and rules make any public disability decision irrelevant to this case.

### H. AN IME WAS NOT APPROPRIATE GIVEN BLACKWOOD'S DELAY

Blackwood complains that Sun life should have sought an IME to determine her condition during the elimination period.  Blackwood fails to mention that she waited almost six months to initiate her claim, and that she did not return her claim forms to Sun Life until after the elimination period expired.   The medical records were not provided by Blackwood's physicians until May 2007.  An IME at that point would not have provided any useful information about Blackwood's condition from August 16, 2006 – February 17, 2007.  This is particularly true given Dr. Wittlinger's letter indicating that Blackwood's condition changed significantly around April 2007.  [R. 361].  Any blame for the inability to conduct a physical exam during the elimination period must be borne by Blackwood for her unexplained delay in initiating her claim.

### I. THE COURT CANNOT AWARD MORE THAN 24 MONTHS OF BENEFITS

The Court should uphold Sun Life's decision and enter judgment in its favor. However, if the Court decides to award long term disability benefits, the award must be limited to 24 months for several reasons.

### 1. <u>The Court Can Not Award "Any Occupation" Benefits</u>

The Policy contains an initial 24-month period where an employee may receive benefits if a she is disabled from performing her own occupation.  At the conclusion of this 24 month period, no further benefits are payable unless the claimant proves that she is unable to perform "any Gainful Occupation for which he is or becomes reasonably

qualified for by education, training or experience." Sun Life determined that Blackwood was not disabled under the "own occupation" provision but did not determine whether she was disabled under the "any occupation" provision because Sun Life made its determination before the "any occupation" period began. Accordingly, to the extent that this Court finds that Blackwood is entitled to benefits, it should remand the "any occupation" claim to the benefits administrator for an initial determination under the Policy's "any occupation" standard.

Several courts have held that where a claim administrator has not made a decision on a portion of an ERISA plan, the proper remedy is to remand to the administrator for a decision in the first instance. For example, in *Pakovich v. Broadspire Services, Inc.,* 535 F.3d 601 (7th Cir. 2008), a district court overturned a denial of disability benefits rendered under an "own occupation" provision and, although the administrator had not made a determination as to the claimant's eligibility for benefits under the plan's "any occupation" provision, the district court went ahead and determined that the plaintiff was not entitled to any occupation benefits. The Seventh Circuit reversed the latter determination, holding that the district court should have remanded the any occupation issue to the claim administrator, stating that "when the plan administrator has not issued a decision on a claim for benefits that is now before the courts, the matter must be sent back to the plan administrator to address the issue in the first instance." *Id.* at 606. Likewise, in *Peterson v. Continental Cas. Co.,* 282 F.3d 112 (2d Cir. 2002), the disability plan also divided benefits into discrete periods governed by different definitions of disability. Where the claim was denied under the initial period, the Second Circuit reversed a district court determination of the plaintiff's

eligibility under a later period and the matter was remanded to the claim administrator for a determination of eligibility under the later period in the first instance. *Id.* at 118 ("Absent a decision by the plan administrator, district courts have no jurisdiction to make an assessment of a beneficiary's eligibility for benefits."). *See also Seman v. FMC Corp. Retirement Plan for Hourly Employees,* 334 F.3d 728, 733 (8th Cir. 2003) ("When a plan administrator fails to render any decision whatsoever on a participant's application for benefits, it leaves the courts with nothing to review under any standard of review, so the matter must be sent back to the administrator for a decision.").

These cases are consistent with Ninth Circuit law on this subject. In *Patterson v. Hughes Aircraft Co.,* 11 F.3d 948 (9th Cir. 1993), an ERISA disability plan expressly limited benefits for certain mental disabilities to two years. As with the change from "own occupation" to "any occupation" definition of disability, after receiving benefits for two years, a claimant in the Hughes Aircraft plan was required to prove that he was disabled from a non-mental condition in order to recover additional benefits. After the plaintiff in that case received benefits for two years, his benefits were terminated based on the administrator's interpretation of what constituted a "mental" disability. The Ninth Circuit held that the administrator's interpretation was incorrect but, because the administrator had not yet made a determination under the court's interpretation, the Ninth Circuit ordered that the matter be remanded to the administrator for a determination of the plaintiff's entitlement to additional benefits under the new definition. *Id.* at 951. Similarly, in *Prado v. Allied Domecq,* No. C-05-2716, 2008 WL 191985 (N.D. Cal. Jan. 22, 2008), a disability plan, like the plan in this case, provided "own occupation" benefits for a limited period,

after which the claimant was required to prove disability under an "any occupation" provision.  After the administrator denied "own occupation" benefits, the court overturned the decision and awarded "own occupation" benefits.  However, the court concluded that there was insufficient evidence to determine whether the plaintiff was disabled under the more restrictive definition and remanded the matter to the claim administrator for a determination of "any occupation" benefits in the first instance.

Here, the Court must decide whether Sun Life correctly found that Blackwood was not disabled under the Policy's "own occupation" definition.  Blackwood has not yet made a claim under the Policy's more stringent "any occupation" definition of disability.  There is no administrative record as to whether or not she qualifies for benefits under the "any occupation" definition.  The Court has nothing to review in relation to a claim of benefits under the "any occupation" standard.  The law is clear in these situations: To the extent that the Court finds that Blackwood is entitled to benefits under the "own occupation" period of the plan, it must remand to Sun Life for an initial determination of Blackwood's eligibility under the Policy's "any occupation" provision.

**2.  Benefits For Blackwood's Conditions Are Limited**

Blackwood has spent a significant portion of her brief arguing that she was disabled as a result of cognitive deficits and memory problems.  Under the terms of the Policy, mental Illness includes mental, nervous, emotional, cognitive, or stress-related abnormality, disorder, dysfunction or syndrome regardless of cause and would encompass Blackwood's alleged condition.  [R. 10].  To the extent Blackwood had physical complaints of body weakness, joint pain, neuropathy, and fatigue, such conditions would be considered chronic

fatigue syndrome and/or musculoskeletal and connective tissue illness as defined by the Policy. [R. 9, 11]. The Policy limits long term disability benefits to 24 months for chronic fatigue illness, musculoskeletal and connective tissue illness, and mental illness. [R. 9 – 11, 23-24]. Therefore, even if Blackwood was totally disabled, her recovery would be limited to a total of 24 months of benefits.

# IV.  CONCLUSION

Based upon the foregoing facts and authority, judgment should be entered in favor of Defendants.

DATED:  April 20, 2009                OGLETREE, DEAKINS, NASH, SMOAK &
                                      STEWART, P.C.


                                      By:  ___s/ Eric P. Mathisen_____
                                      Linda Claxton
                                      Eric P. Mathisen
                                      Attorneys for Defendants

DEFENDANTS' TRIAL BRIEF

**CERTIFICATE OF SERVICE BY UNITED STATES MAIL**

STATE OF INDIANA, COUNTY OF PORTER

I am employed in the County of Porter, State of Indiana; I am over the age of 18 years and not a party to this action.  My business address is 225 Aberdeen Drive, Suite F, Valparaiso, IN 46385.

On April 20, 2009, I served the following document(s) described as:

**DEFENDANTS' TRIAL BRIEF**

on the persons below as follows:

STEVEN MICHAEL MCQUILLAN
JACOBSEN    HANSEN    NAJARIAN    AND
MCQUILLAN
1690 WEST SHAW AVENUE
SUITE 201
FRESNO, CA 93711-1073
559-448-0400

I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses as indicated above and placed the envelope or package for collection and mailing, following our ordinary business practices.  I am readily familiar with this business's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United State Postal Service, in a sealed envelope or package with postage fully prepaid.

I am employed in the county where the mailing occurred.  The envelope or package was placed in the mail at Valparaiso, Indiana.

I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on April 20, 2009, at Valparaiso, Indiana.

Leann Kesler                                                        /s/ Leann Kesler
Type Name                                                        Signature